John **NICHOLS**, Plaintiff,

v.

**UNITED STATES** of America et al., Defendants.

Civ. A. No. T–4761.

United States District Court, D. Kansas.

Feb. 24, 1971.

**132**

Sam A. Crow, John E. Wilkinson, Topeka, Kan., M. C. Slough, St. Marys, Kan., for plaintiff.

Robert J. Roth, U. S. Atty., Edward H. Funston, Asst. U. S. Atty., Topeka, Kan., Harland F. Leathers, Jeffrey F. Axelrad, Attys., Dept. of Justice, Washington, D. C., for defendants.

## RULING ON MOTION OF DEFENDANTS FOR SUMMARY JUDGMENT

TEMPLAR, District Judge.

Plaintiff is a physician duly licensed in Kansas to practice as such and, for the purpose of considering the motion filed by defendants to dismiss or in the alternative for summary judgment, is presumably a qualified pathologist with experience in examining gunshot wounds including their interpretation by X-ray. Plaintiff has instituted this action against the United States of America, the Archivist of the United States, the General Services Administration and the Secretary of the Navy.

The action is brought under provisions of the Federal Public Records Law, being 5 U.S.C. Sections 551–552 (80 Stat. 250, 1966), and venue is claimed under provisions of 28 U.S.C. Section 1391(e) (4). Defendants included are General Services Administration, National Archives and Record Service, and the Department of the Navy.

Plaintiff alleges a general interest in scientific matters and particularly in the areas of pathology and related research. He alleges that he wishes to study certain items of evidence, in custody or in possession of the defendants, which will afford him an opportunity to resolve conflicting opinions, conclusions and uncertainties concerning the death of the late President John F. Kennedy. He alleges, in substance, that following proper request to them, defendants have either refused him permission to examine the materials described in his complaint or have ignored his requests for such permission.

Briefly stated, plaintiff desires to inspect, study, examine and, as to some materials, submit described material to "neutron activation analysis." He also wishes to see and examine X-rays and photographs made at the autopsy of President Kennedy, various Warren Commission exhibits and the President's clothing worn at the time of the assassination.

Defendants have filed a motion to dismiss or in the alternative for summary judgment. Since affidavits and evidence outside the pleadings have been submitted in support of the motion, under the direction of Federal Rules of Civil Procedure 12(c), the issues raised should properly be considered under Federal Rules of Civil Procedure 56. The Court has been provided with extensive briefs by all parties and assumes that all parties have presented all material they deem pertinent under that rule.

"The rule followed by this Circuit in regard to motions for summary judgment is clear and while it is the duty of the trial court to grant a motion for summary judgment in an appropriate case, the relief contemplated by Rule 56 is drastic, and should be applied with caution to the end that the litigants will have a trial on bona fide factual disputes. Under the rule no margin exists for the disposition of

the factual issues, and it does not serve as a substitute for a trial of the case nor require the parties to dispose of litigation through the use of affidavits. The pleadings are to be construed liberally in favor of the party against whom the motion is made, but the court may pierce the pleadings, and determine from the depositions, admissions and affidavits, if any, in the record whether material issues of fact actually exist. If, after such scrutiny, any issue as to a material fact dispositive of right or duty remains the case is not ripe for disposition by summary judgment, and the parties are entitled to a trial."

Machinery Center, Inc. v. Anchor National Life Insurance Company, 434 F.2d 1, 6, 10th Cir.

With this guideline to follow in considering defendants' motion, the several grounds advanced by them will be considered to the extent necessary for ruling on the motion as one for summary judgment.

## JURISDICTION OF THE COURT— MATERIAL REQUESTED AS "RECORDS"

Defendants question the Court's jurisdiction over the subject matter because plaintiff's demands do not constitute requests for any "identifiable records."

The items requested by plaintiff could scarcely be more clearly identified by him, but a more substantial issue is raised by defendants under their contention that much of the material requested does not fall within the classification of "records" within the purview of the statute.

■ That the Federal Public Records Law or Information Act, through which plaintiff seeks to obtain information denied him by agencies of the United States, was intended to require disclosure of government records to any person on proper application is clear, and in considering the issues raised under a motion for summary judgment should be liberally construed to carry out the express purpose of the act, which is discussed by Judge Croake in Consumers Union of United States, Inc. v. Veterans Administration, D. C., 301 F.Supp. 796, at 799.

"Consumer Union's request for VA records came in the wake of the passage of the Freedom of Information Act. The key portion of that Act, now codified, is as follows:

* * * each agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed, shall make the records promptly available to any person. * * *

The purpose of the Act, seen in the statutory language and the legislative history, was to reverse the self-protective attitude of the agencies under which they had found that the public interest required, for example, that the names of unsuccessful contract bidders be kept from the public. The Act made disclosure the general rule and permitted only information specifically exempted to be withheld; it required the agency to carry the burden of sustaining its decision to withhold information in a de novo equity proceeding in a district court. Disclosure is thus the guiding star for this court in construing the Act. Because portions of the Act are patently ambiguous, its illumination will be most useful."

■ And so, in considering this matter under a motion for summary judgment, unless the material sought cannot be described as a "record" required to be produced within the meaning of the Act, or if a record, does not fall within the numerous exemption provisions of the Act, then as to such a specific record, the motion must be denied.

Under Federal Rules of Civil Procedure 56(d), the Court is authorized to ascertain what material facts exist without substantial controversy and what material facts are actually and in good

faith controverted. An order may then be made specifying facts that appear without substantial controversy and directing such further proceedings in the action as are just.

Because the term "records" is not defined in the Act, the Court is initially put to the task of deciding which of the items requested by plaintiff may be so classified within the contemplation of the statute. It is unfortunate that attention was not given to this point when the law was enacted since the positive provisions of the Act are all but smothered by some nine broad and generalized statements providing for many exemptions.

Efforts have been made to classify the material which may be considered as a record under the Act, e. g., the General Services Administration adopted the following definition in 41 C.F.R. 105–60.-104(a):

"(a) Records. The term 'records' means all books, papers, maps, photographs, or other documentary materials, regardless of physical form or characteristics, made or received by GSA in pursuance of Federal law or in connection with the transaction of public business and preserved or appropriate for preservation as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of GSA or because of the informational value of data contained therein."

Again, this definition is followed by several general statements of what the defined term does not include.

Not included is library and museum material made or acquired and preserved solely for reference or exhibition purposes; objects or articles, such as structures, furniture, paintings, sculpture, models, vehicles or equipment (not defined), and donated historical materials (as defined in 105–61.001–4), accepted by GSA from a source other than an agency of the United States Government in accordance with provisions of 44 U.S.

C. § 397 (now 44 U.S.C. §§ 2107 and 2108).

Then, paragraph (b) of the section states:

"(b) Availability. The term 'availability' signifies the right of the public to obtain information, purchase materials, and inspect and copy records and other pertinent information."

If these regulations were designed to be a clarification of what was intended by the term "record," a failure of purpose must be registered. Nor do the declarations of the General Services Administration subtract from the confusion. The Attorney General's memorandum on the Public Information Section of the Administrative Procedure Act offers little help but simply quotes 44 U. S.C. § 366, now 44 U.S.C. § 3301, stating what material is included by the term "records," and specifically excluding "library and museum material made or acquired and preserved solely for reference or exhibition purposes * * *." Just what constitutes "library and museum material" is not designated or defined.

44 U.S.C. § 3301 offers some illumination when it declares that the word "records" includes all books, papers, maps, photographs, *or other documentary materials*, regardless of form or characteristics. (Emphasis added.) But again comes the question, what are "documentary materials"? In Jones on Evidence, 5th Ed., Vol. 3, p. 1043, § 535, is found this helpful statement:

"For all practical purposes the term 'document' may be considered as synonymous with 'writing.' A document has been defined as 'any substance having any matter expressed or described upon it by marks capable of being read.' A writing or document, in addition to handwritten or printed or typewritten instruments, which first come to mind, should include inscribed chattels, photographic or other mechanical reproductions and sound recordings—even though in the case of sound recordings the inscribed

marks may not be visible to the eye and may be read only with the use of mechanical devices."

 This Court must assume that since no better definition of the term, "record," is provided by legislative enactment, executive order or controlling judicial determination, reliance may be placed on a dictionary of respected ancestry for a reasonably accurate meaning of the word. In Webster's New International Dictionary, this definition appears:

"That which is written or transcribed to perpetuate knowledge of acts or events; also, that on which such record is made, as a monument; a memorial."

Again, in Webster's New Collegiate Dictionary, the word record is defined as,

"That which is written to perpetuate a knowledge of events * * * that on which such a record is made, a monument."

Though the word "records" was used in the United States Constitution, Article IV, Section 1, in which full faith and credit is required to be given in each state to the public records of every other state, I am unable to find a judicial interpretation of what is intended by the use of the word "records," nor is one shown to me. An examination of Words and Phrases likewise has offered little aid in defining the term.

 A record is intended to serve as evidence of something written, said or done and is not kept to gratify the curious or suspicious. Owens v. Woolridge, 22 Pa.Co.Ct.Rep., 237, 240.

 Thus, under any reasonable calculation of what is intended to be covered by the congressional enactment referred to as the Information Act, it seems clear that the provisions of 5 U.S.C. § 552, under which plaintiff seeks relief, limits the authority of a district court to enjoin an agency from withholding *records* and to order production of any agency *records* improperly held from complainant.

Without being concerned with the numerous exemptions provided in the Act under which defendants seek to avoid compliance with the general terms of the Act, we might consider the items for which request was made and to which the statute in its present form could not apply.

 If the statute is to receive a broader application, Congress must enlarge its provisions to apply to items this Court does not believe were intended to be included in its provisions. The following items requested by plaintiff for examination, inspection and study, described in paragraph 5 of plaintiff's complaint may not be classified as a "record" within the meaning of the Act, to wit:

(a) The 6.5 mm Mannlicher-Carcano rifle, C2766, formerly the property of the late Lee Harvey Oswald. This was designated as Exhibit CE 139 in the Warren Report.

(b) A live 6.5 mm round manufactured by Western Cartridge Company and found in the chamber of Oswald's Rifle, C2766. Warren Report Exhibit CE141.

(c) The coat worn by President Kennedy at the moment of his assassination believed to contain trace metals from bullet CE399. The coat is Warren Report Exhibit CE393.

(d) The shirt worn by President Kennedy at the moment of his assassination believed to contain trace metals from the bullet that penetrated the fabric. Warren Report Exhibit CE344.

(e) There is no subparagraph (e).

(f) The 6.5 mm bullet found on the floor of Parkland Memorial Hospital in Dallas, Texas on November 22, 1963, where the late President and Governor Connally received medical treatment, believed to be the bullet that traversed the President's neck and

on through the body of Connally. Warren Report Exhibit CE399.

(g) Three empty 6.5 mm Cartridge cases manufactured by Western Cartridge Company and found on the floor of the room on the 6th floor of the Texas School Book Depository in Dallas, Texas. Warren Report Exhibits CE543, CE544 and CE545.

(h) Bullet recovered from the wall of the home of General Edwin A. Walker in Dallas, Texas. Warren Report Exhibit 573.

(i) The clip presumably from the magazine of the Oswald Rifle, C2766. Warren Report Exhibit CE575.

(j) The two or three metal fragments removed from the wrist of Governor Connally. Warren Report Exhibit CE842.

(k) Fragments of metal removed from the brain of the late President at autopsy. Warren Report Exhibit CE843.

(l) A mutilated bullet recovered by United States personnel after firing through a cadaver's wrist for the purpose of weighing it. Warren Report Exhibit CE856.

■ Defendants also rely on provisions of 44 U.S.C. §§ 2107 and 2108(c) to justify their refusal to produce for examination and inspection items identified and described by plaintiff in paragraph 6 of plaintiff's complaint because they are now in possession of the defendant Archivist Division of General Services Administration by virtue of their transfer to the agency by an authorized representative of the Estate of John F. Kennedy. The described property was received by the agency as a gift subject to the conditions and restrictions specified by the donor. Plaintiff contends that the Letter Agreement, dated October 29, 1966, on behalf of the Kennedy Estate is a nullity because the parties to it assumed that the estate had full title to the materials described therein. He asserts that, in fact, the archivist had these items, which plaintiff seeks to examine, in his custody under a memorandum of transfer dated April 26, 1965, and by such transfer the items of material so transferred became the property of the United States and that the rules and guidelines of the Letter Agreement cannot be used to exclude the right of a citizen to examine that property which already belonged to the United States. The Court does not believe plaintiff's contention to be correct.

The applicable statute does not require that the items of property deposited with the Archivist be owned by the donor if they fall within the description of those things which may be deposited. Under the provisions of the Letter Agreement, no examination of this material may be permitted without permission of the Kennedy family representative within five years of October 29, 1966. It is not claimed by plaintiff that such permission has been obtained.

■ Furthermore, a review of PL 89–318, 79 Stat. 1185, enacted in 1965, discloses that Congress provided for the acquisition and preservation of certain items of evidence pertaining to the assassination of President Kennedy. Pursuant to that law, the Attorney General was given authority for one year to acquire various items. The act provided for the vesting of title and interest in the United States and provided for just compensation under circumstances requiring this. Some of the items identified in plaintiff's request were included in the acquisition of material obtained and delivered to GSA by the Attorney General. The proceedings taken for that purpose are valid. Cf. United States v. One 6.5 mm. Mannlicher-Carcano Military Rifle, etc., 5 Cir., 406 F.2d 1170. Also, under the provisions of PL 373, 69 Stat. 695, now 44 U.S.C. § 2108, the administrator of General Services was authorized to accept for deposit the papers and other historical materials of any president, and documents, including

motion-picture film, still pictures, etc., from private sources.

The act also provided:

"That papers, documents, or other historical materials accepted and deposited under subsection (e) and this subsection shall be held subject to such restrictions respecting their availability and use as may be specified in writing by the donors or depositors, including the restriction that they shall be kept in a Presidential archival depository, and such restrictions shall be respected for so long a period as shall have been specified, or until they are revoked or terminated by the donors or depositors or by persons legally qualified to act on their behalf with respect thereto."

■ The Court can attach no significance to the fact that the material was deposited with GSA in April, 1965, while the Letter Agreement placing restrictions on their use was not entered into until October 29, 1966.

■ The administrator of GSA had a continuing responsibility under the terms of the Act to negotiate and take such steps for the deposit and preservation of Presidential historical materials so as to secure for the government, as far as possible, the right to have continuous and permanent possession of such material. This was a continuing responsibility of the administrator. He was authorized to accept papers, documents or other historical materials (records are not mentioned but presumably intended to be included) subject to such restrictions as to availability and use as may be specified in writing by the donors or depositors.

The Letter Agreement of 1966 was entered into by the parties under the provisions of then existing law. Under this Letter Agreement, the items requested by plaintiff in paragraph 6 of his complaint may be withheld from disclosure or examination since the time limit of five years therein provided has not expired. Other reasons may exist for such refusal but need not now be considered.

Plaintiff, in addition to the items requested above, sought, as alleged in paragraph 8 of his complaint, three additional items specifically described as:

(a) A grey-brown rectangular structure measuring approximately 13 x 20 mm seen in photographs of the base of the brain of the late President Kennedy.

(b) Histological preparations of the margins of the bullet holes in the skin of the neck of the late President Kennedy which were part of the Bethesda autopsy.

(c) The written diagnosis or findings made by the Bethesda Hospital radiologist from his X-ray study of X-ray films taken at the autopsy of the late President.

■ The Court believes that requests for items described in (a) and (b) above cannot be classified as records within the meaning of 5 U.S.C. § 552, but that the diagnosis and findings of the radiologist is a record.

In this connection, request was made on the Secretary of the Navy for the diagnosis and findings. By positive affidavit, Mr. George M. Davis, Vice Admiral, Chief of Bureau of Medicine and Surgery of the Medical Corps, U. S. Navy, having command jurisdiction over the Bethesda Naval Hospital, denies any custody or control by that agency of the radiologist's report or of any of the other items requested of the Navy for examination. (Doc. 13.) It appears from this affidavit that the material requested was delivered to agents of the United States Secret Service on or about November 22, 1963. The accuracy of this affidavit is not challenged and the Court may not require production of records not in custody or control of an agency.

Defendant archivist offers to show the 8 mm motion picture of the assassination at the building housing the archives of the United States at Washington, and to supply a large scale map of Dealy Plaza in Dallas, Texas.

While a view of the motion picture in the federal courtroom here in Topeka

would be a matter of substantial interest to this Court, under the circumstances, no useful purpose would be served by such exhibition. The assassination of President Kennedy continues to give rise to much speculation and scientific analysis by students, pathologists, historians and law enforcement agencies. Undoubtedly much more will be discussed and written about the case, the circumstances of which has aroused worldwide curiosity.

Though the Information Act, under which plaintiff seeks relief and it is only because of its terms that this Court has any jurisdiction, does by its terms require the production of all records by the agency having custody of them, the government agencies seem prone to deny disclosure and to withhold records under the many exemptions, including those enumerated in the statute, and under other statutory laws, the common law, by reason of executive privilege, by executive orders, or by agency-made law in the form of regulations and orders.

Until Congress sees fit to wipe out these exemptions, so far as it is constitutionally able to do so, a person in plaintiff's position, though he be possessed with superb qualifications, has the purest intentions and be so ever objective in his research and entitled to pursue it, will be thwarted by the influence and pressures exerted by bureaucrats which will likely hamper his investigations, no matter how noble and patriotic his purpose.

The Information Act leaves a good many things not clearly defined. Because of this, the Attorney General issued a memorandum analyzing the act. He indicates that actions for injunctions permitted by the act should be maintained against the agency refusing to make requested agency records available to the person requesting them rather than the head of the agency or one or more of its officers. Government agencies, when notified that they are to come before the Court, should not be too technical about the manner in which they are described or served. I hold in this case that the agencies named in the pleadings are properly before the Court.

The Court must determine, from what has been said, that the exemptions provided in the Information Act leave unavailable most material sought by a citizen in situations where an agency may resort to one or more of the many excuses afforded under the exemption provisions, as here.

After thorough consideration of the record in this case and a study of the applicable statutes and regulations, I must conclude that no material issue of fact exists, that under the law the case is ripe for disposition by summary judgment, and that the motion of defendants to dismiss, treated as a motion for summary judgment, must be sustained.

It is so ordered.