# KISSINGER *v.* REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS ET AL.

No. 78–1088.   Argued October 31, 1979—Decided March 3, 1980*

---

*Together with No. 78–1217, *Reporters Committee for Freedom of the Press et al.* v. *Kissinger,* also on certiorari to the same court.

138

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and POWELL, JJ., joined. BRENNAN, J., *post*, p. 158, and STEVENS, J., *post*, p. 161, filed opinions concurring in part and dissenting in part. MARSHALL, J., took no part in the consideration or decision of the cases. BLACKMUN, J., took no part in the decision of the cases.

*David Ginsburg* argued the cause for petitioner in No. 78–1088 and respondent in No. 78–1217. With him on the briefs

was *James E. Wesner.* *William Alsup* argued the cause for the federal parties in both cases. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Schiffer, Deputy Solicitor General Easterbrook,* and *Michael Kimmel.*

*Robert M. Sussman* argued the cause for the Reporters Committee for Freedom of the Press in both cases. With him on the brief were *Charles A. Horsky* and *Peter Barton Hutt. William A. Dobrovir* argued the cause for the Military Audit Project in both cases. With him on the brief was *Andra N. Oakes.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The Freedom of Information Act (FOIA) vests jurisdiction in federal district courts to enjoin an "agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U. S. C. § 552 (a)(4)(B). We hold today that even if a document requested under the FOIA is wrongfully in the possession of a party not an "agency," the agency which received the request does not "improperly withhold" those materials by its refusal to institute a retrieval action. When an agency has demonstrated that it has not "withheld" requested records in violation of the standards established by Congress, the federal courts have no authority to order the production of such records under the FOIA.

## I

This litigation arises out of FOIA requests seeking access to various transcriptions of petitioner Kissinger's telephone conversations. The questions presented by the petition necessitate a thorough review of the facts.

## A

Henry Kissinger served in the Nixon and Ford administrations for eight years. He assumed the position of Assistant

to the President for National Security Affairs in January 1969. In September 1973, Kissinger was appointed to the office of Secretary of State, but retained his National Security Affairs advisory position until November 3, 1975. After his resignation from the latter position, Kissinger continued to serve as Secretary of State until January 20, 1977. Throughout this period of Government service, Kissinger's secretaries generally monitored his telephone conversations and recorded their contents either by shorthand or on tape. The stenographic notes or tapes were used to prepare detailed summaries, and sometimes verbatim transcripts, of Kissinger's conversations.[1] Since Kissinger's secretaries generally monitored all of his conversations, the summaries discussed official business as well as personal matters. The summaries and transcripts prepared from the electronic or stenographic recording of his telephone conversations throughout his entire tenure in Government service were stored in his office at the State Department in personal files.

On October 29, 1976, while still Secretary of State, Kissinger arranged to move the telephone notes from his office in the State Department to the New York estate of Nelson Rockefeller. Before removing the notes, Kissinger did not consult the State Department's Foreign Affairs Document and Reference Center (FADRC), the center responsible for implementing the State Department's record maintenance and disposal program. Nor did he consult the National Archives and Records Service (NARS), a branch of the General Services Administration (GSA) which is responsible for records preservation throughout the Federal Government. Kissinger had obtained an opinion from the Legal Adviser of the Department of State, however, advising him that the telephone summaries were not agency records but were his personal

---

[1] Tapes and stenographic notes were always destroyed immediately after they were summarized or transcribed.

papers which he would be free to take when he left office.[2]

After Kissinger effected this physical transfer of the notes, he entered into two agreements with the Library of Congress deeding his private papers. In the first agreement, dated November 12, 1976, Kissinger deeded to the United States, in care of the Library of Congress, one collection of papers. Kissinger's telephone notes were not included in this collection. The agreement established terms obligating Kissinger to comply with certain restrictions on the inclusion of official documents in the collection and obligating the Library to respect restrictions on access. The agreement required that official materials in the collection would consist of "copies of government papers of which there is an original or record copy in government files." It also provided that all such materials must have been "approved for inclusion in the Collection" by "authorized officials."

Public access to the collection, under the terms of the deed, will not begin until 25 years after the transfer or 5 years after Kissinger's death, whichever is later. Until that time, access is restricted to (1) employees of the Library of Congress who have been jointly approved by the Library of Congress and Mr. Kissinger; (2) persons who have received the written permission of Mr. Kissinger; and (3) after Kissinger's death, persons who have received the written permission of a committee to be named in his will. Kissinger and all of his research assistants who have appropriate security clearance retain unrestricted access to the collection.

After this agreement was executed, the Department of State formulated procedures for the review of the documents and their transfer to the Library of Congress. Employees reviewed the collection and retained (a) original or record copies

---

[2] This conclusion was premised on the Adviser's finding that the notes were covered by a Department regulation providing that a retiring official may retain papers "explicitly designated or filed as personal at the time of origin or receipt." 5 FAM § 417.1 (a) (1974).

of documents belonging to the agency, and (b) any materials containing classified information. In the donation process, Kissinger was also required to sign the Department's Standard Separation Statement affirming that he had "surrendered to responsible officials . . . documents or material containing classified or administratively controlled information furnished . . . during the course of [Government] employment or developed as a consequence thereof, including any diaries, memorandums of conversations, or other documents of a personal nature. . . ."

On December 24, 1976, by a second deed, Kissinger donated a second collection consisting of his telephone notes. This second agreement with the Library of Congress incorporated by reference all of the terms and conditions of the first agreement. It provided in addition, however, that public access to the transcripts would be permitted only with the consent, or upon the death, of the other parties to the telephone conversations in question.

On December 28, 1976, the transcripts were transported directly to the Library from the Rockefeller estate. Thus the transcripts were not reviewed by the Department of State Document and Reference Center with the first collection of donated papers before they were delivered into the possession of the Library of Congress. Several weeks after they were moved to the Library, however, one of Kissinger's personal aides did extract portions of the transcripts for inclusion in the files of the State Department and the National Security Council. Pursuant to the instructions of the State Department Legal Adviser, the aide included in the extracts, "any significant policy decisions or actions not otherwise reflected in the Department's records."

## B

Three separate FOIA requests form the basis of this litigation. All three requests were filed while Kissinger was Secretary of State, but only one request was filed prior to the

removal of the telephone notes from the premises of the State Department. This first request was filed by William Safire, a New York Times columnist, on January 14, 1976. Safire requested the Department of State to produce any transcripts of Kissinger's telephone conversations between January 21, 1969, and February 12, 1971, in which (1) Safire's name appeared or (2) Kissinger discussed the subject of information "leaks" with certain named White House officials. The Department denied Safire's FOIA request by letter of February 11, 1976. The Department letter reasoned that the requested notes had been made while Kissinger was National Security Adviser and therefore were not agency records subject to FOIA disclosure.[3]

The second FOIA request was filed on December 28 and 29, 1976, by the Military Audit Project (MAP) after Kissinger publicly announced the gift of his telephone notes to the United States and their placement in the Library of Congress. The MAP request, filed with the Department of State, sought records of all Kissinger's conversations made while Secretary of State and National Security Adviser. On January 18, 1977, the Legal Adviser of the Department of State denied the request on two grounds. First, he found that the notes were not agency records. Second, the deposit of the notes with the Library of Congress prior to the request terminated the Department's custody and control. The denial was affirmed on administrative appeal.

The third FOIA request was filed on January 13, 1977, by the Reporters Committee for Freedom of the Press (RCFP), the American Historical Association, the American Pol'tical Science Association, and a number of other journalists (collectively referred to as the RCFP requesters). This request also sought production of the telephone notes made by Kissinger both while he was National Security Adviser and

---

[3] Safire filed an administrative appeal from this decision, contending that the notes were agency records by virtue of their relocation to the State Department. The appeal was denied.

Secretary of State. The request was denied for the same reasons given to the MAP requesters.

The United States has taken some action to seek recovery of the notes for record processing. On January 4, 1977, the Government Archivist wrote to Kissinger, requesting that he be permitted to inspect the telephone notes so that he could determine whether they were Department records, and to determine whether Kissinger had authority to remove them from Department custody. The State Department Legal Adviser, however, analyzed the Archivist's request and issued a memorandum concluding that so long as extracts of the official business contained in the notes were filed as agency records, Kissinger had complied with the Department's regulations. The Legal Adviser also concluded that the inspection procedures suggested by the Archivist would compromise the Department's policy of respecting the privacy of such secretarial notes and would discourage the creation of historical materials in the first instance. On January 18, 1977, Kissinger replied to the Archivist, declining to permit access.

The Archivist renewed his request for an inspection on February 11, 1977, by which time Kissinger was no longer Secretary of State. With the request, he enclosed a memorandum of law prepared by the General Counsel of the GSA concluding that the materials in question might well be records rather than personal files and that the Archivist was entitled to inspect them under the Federal Records and Records Disposal Acts, 44 U. S. C. §§ 2901–2909, 3101–3107; 44 U. S. C. §§ 3301–3314 (1976 ed. and Supp. II). Kissinger did not respond to the Archivist's second request.

## C

Proceedings in the United States District Court for the District of Columbia commenced February 8, 1977. The RCFP requesters and Safire instituted an action under the FOIA, seeking enforcement of their FOIA requests. On March 8, 1977, MAP filed a similar suit. Both suits named

Kissinger, the Library of Congress, the Secretary of State and the Department of State as defendants. The plaintiffs sought a judgment declaring that the summaries were agency records that had been unlawfully removed and were being improperly withheld. Plaintiffs requested as ultimate relief that the court require the Library to return the transcripts to the Department with directions to process them for disclosure under the FOIA.

Cross-motions for summary judgment were filed by all plaintiffs and by Kissinger. The District Judge ruled in plaintiffs' favor as to transcripts produced while Kissinger was Secretary of State, but denied relief as to transcripts of conversations produced while Kissinger was Special Assistant to the President. The court first found that the transcripts of telephone conversations were "agency records" subject to disclosure under the FOIA. The court also found that Kissinger had wrongfully removed these records by not obtaining the prior approval of the Administrator of General Services. The court recognized that the FOIA did not directly provide for relief since the records were in the custody of the Library of Congress, which is not an "agency" under the Act. Nevertheless, the court held that the FOIA permitted the court to invoke its equitable powers "to order the return of wrongfully removed agency documents where a statutory retrieval action appears unlikely."

An order was entered requiring the Library to return the documents to the Department of State; requiring the Department of State to determine which of the summaries are exempt from disclosure under the FOIA, and to provide the required materials to the plaintiffs. The court denied the production of summaries made during Kissinger's tenure as National Security Adviser on the basis of a mistaken assumption that plaintiffs had withdrawn their request for these summaries.

Both Kissinger and the private parties appealed from the lower court judgment. The Court of Appeals, without dis-

cussion, affirmed the trial court judgment ordering production of the summaries made while Kissinger was Secretary of State. The Court of Appeals also held that the summaries made during Kissinger's service as National Security Adviser need not be produced. The court found that this request had not been withdrawn, and reasoned that three considerations supported nonproduction: (1) the FOIA does not cover those Presidential advisers "who are so close to him as to be within the White House"; (2) the relocation of the transcripts to the State Department did not bring them within its disclosure responsibilities under the FOIA; and (3) the fact that portions of the transcripts may reflect the affairs of the NSC, an agency to which the FOIA *does* apply, provided no basis for disclosure in the absence of an FOIA request directed to that agency.

Kissinger filed a petition for certiorari requesting this Court to review the Court of Appeals' determination that the State Department had improperly withheld agency records, thereby permitting their production from the Library of Congress. The RCFP requesters filed a cross-petition seeking review of that court's judgment denying production of the conversations transcribed while Kissinger served as National Security Adviser. We granted both petitions, 441 U. S. 904, and we now affirm in part and reverse in part.

## II

We first address the issue presented by Kissinger—whether the District Court possessed the authority to order the transfer of that portion of the deeded collection, including the transcripts of all conversations Kissinger made while Secretary of State, from the Library of Congress to the Department of State at the behest of the named plaintiffs. The lower courts premised this exercise of jurisdiction on their findings that the papers were "agency records" and that they had been wrongfully removed from State Department custody in viola-

tion of the Federal Records Disposal Act, 44 U. S. C. § 3303. We need not, and do not, decide whether the telephone notes are agency records, or were wrongfully removed, for even assuming an affirmative answer to each of these questions, the FOIA plaintiffs were not entitled to relief.

The question must be, of course, whether Congress has conferred jurisdiction on the federal courts to impose this remedy. Two statutory schemes are relevant to this inquiry. First, if Congress contemplated a private right of action under the Federal Records Act and the Federal Records Disposal Act, this would in itself justify the remedy imposed if Kissinger in fact wrongfully removed the documents. In the alternative, the lower court order could be sustained if authorized by the FOIA.

### A

The Federal Records Act of 1950, 44 U. S. C. § 2901 *et seq.,* authorizes the "head of each Federal agency" to establish a "records management program" and to define the extent to which documents are "appropriate for preservation" as agency records. The records management program requires that adequate documentation of agency policies and procedures be retained. The Records Disposal Act, a complementary records management Act, provides the exclusive means for record disposal. 44 U. S. C. § 3314.

Under the Records Disposal Act, once a document achieves the status of a "record" as defined by the Act, it may not be alienated or disposed of without the consent of the Administrator of General Services, who has delegated his authority in such matters to the Archivist of the United States. 44 U. S. C. §§ 3303, 3303a, 3308–3314 (1976 ed. and Supp. II); GSA, Delegations of Authority Manual, ADM P. 5450.39A. Thus if Kissinger's telephone notes were "records" within the meaning of the Federal Records Act, a question we do not reach, then Kissinger's transfer might well violate the Act since he did not seek the approval of the Archivist prior to

transferring custody to himself and then to the Library of Congress. We assume such a wrongful removal *arguendo* for the purposes of this opinion.

But the Federal Records Act establishes only one remedy for the improper removal of a "record" from the agency. The head of the agency is required under 44 U. S. C. § 3106 to notify the Attorney General if he determines or "has reason to believe" that records have been improperly removed from the agency. The Administrator of General Services is obligated to assist in such actions. 44 U. S. C. § 2905. At the behest of these administrators, the Attorney General may bring suit to recover the records.

The Archivist did request return of the telephone notes from Kissinger on the basis of his belief that the documents may have been wrongfully removed under the Act. Despite Kissinger's refusal to comply with the Archivist's request, no suit has been instituted against Kissinger to retrieve the records under 44 U. S. C. § 3106.

Plaintiff requesters effectively seek to enforce these requirements of the Acts by seeking the return of the records to State Department custody. No provision of either Act, however, expressly confers a right of action on private parties. Nor do we believe that such a private right of action can be implied.

This Court has spent too many pages identifying the factors relevant to uncovering congressional intent to imply a private cause of action to belabor the topic here.[4] Our most recent pronouncement on the subject, *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11 (1979), readily disposes of the question. First, the language of the Records Acts merely "proscribes certain conduct" and does not "create or alter any civil liabilities." *Id.*, at 19. The Records Act also expressly provides administrative remedies for violations of the duties

---

[4] See *Touche Ross & Co.* v. *Redington,* 442 U. S. 560 (1979); *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979).

it imposes, implicating our conclusion in *Transamerica Mortgage* that it is "an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Ibid.* Finally, the legislative history does not detract from the inference to be drawn from congressional silence, but rather confirms that such silence is purposeful.

The legislative history of the Acts reveals that their purpose was not to benefit private parties, but solely to benefit the agencies themselves and the Federal Government as a whole. The Senate Report to the Federal Records Act of 1950 reveals this focus. S. Rep. No. 2140, 81st Cong., 2d Sess., 4 (1950). The Report states:

"It is well to emphasize that records come into existence, or should do so, not in order to fill filing cabinets or occupy floor space, or even to satisfy the archival needs of this and future generations, but first of all to serve the administrative and executive purposes of the organization that creates them. There is danger of this simple, self-evident fact being lost for lack of emphasis. The measure of effective records management should be its usefulness to the executives who are responsible for accomplishing the substantive purposes of the organization. . . . [The] first interest is in the establishment of a useful system of documentation that will enable [the executive] to have the information he needs available when he needs it."

Congress expressly recognized the need for devising adequate statutory safeguards against the unauthorized removal of agency records, and opted in favor of a system of administrative standards and enforcement. See U. S. Commission on Organization of the Executive Branch of the Government, Task Force Report on Records Management 27 (1949). Thus, regardless of whether Kissinger has violated the Records and Records Disposal Acts, Congress has not vested fed-

eral courts with jurisdiction to adjudicate that question upon suit by a private party. That responsibility is vested in the administrative authorities.[5]

## B

The plaintiff requesters contend that even though the Federal Records and Records Disposal Acts do not contemplate a private right of action, the FOIA nevertheless supplies what was missing from those Acts—congressional intent to permit private actions to recover records wrongfully removed from Government custody. We are, however, unable to read the FOIA as supplying that congressional intent.

The FOIA represents a carefully balanced scheme of public rights and agency obligations designed to foster greater access to agency records than existed prior to its enactment. That statutory scheme authorizes federal courts to ensure private access to requested materials when three requirements have been met. Under 5 U. S. C. § 552 (a)(4)(B) federal jurisdiction is dependent upon a showing that an agency has (1) "improperly"; (2) "withheld"; (3) "agency records." Judicial authority to devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by § 552, if the agency has contravened all three components of this obligation. We find it unnecessary to decide whether the telephone notes were "agency records" since we conclude that a covered agency—here the State Department—has not "withheld" those documents from the plaintiffs. We also need not decide the full contours of a prohibited "withholding." We do decide, however, that Congress did not mean that an agency improperly withholds a document which has been removed from the possession of the agency prior to the filing of the FOIA request. In such a case, the agency has neither

---

[5] We need not decide what remedies might be available to private plaintiffs complaining that the administrators and the Attorney General have breached a duty to enforce the Records Act, since no such action was brought here. See 5 U. S. C. §§ 704, 701 (a)(2), 706 (1).

the custody nor control necessary to enable it to withhold.

In looking for congressional intent, we quite naturally start with the usual meaning of the word "withhold" itself. The requesters would have us read the "hold" out of "withhold." The act described by this word presupposes the actor's possession or control of the item withheld. A refusal to resort to legal remedies to obtain possession is simply not conduct subsumed by the verb "withhold."

The Act and its legislative history do not purport to define the word. An examination of the structure and purposes of the Act, however, indicates that Congress used the word in its usual sense. An agency's failure to sue a third party to obtain possession is not a withholding under the Act.

Several sources suggest directly that agency possession or control is prerequisite to triggering any duties under the FOIA. In the debates, the Act was described as ensuring "access to the information *possessed* by [Government] servants." (Emphasis added.) 112 Cong. Rec. 13652 (1966), reprinted in Freedom of Information Act Source Book, S. Doc. No. 93–82, p. 69 (1974) (remarks of Rep. Monagan) (hereinafter Source Book I).

Following FOIA's enactment in 1966, the Attorney General issued guidelines for the use of all federal departments and agencies in complying with the new statute. The guidelines state that FOIA

> "refers, of course, only to records in being and in the possession or control of an agency. . . . [It] imposes no obligation to compile or *procure* a record in response to a request." Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 23–24 (June 1967), Source Book I, pp. 222–223.

Most courts which have considered the question have concluded that the FOIA is only directed at requiring agencies to disclose those "agency records" for which they have chosen

to retain possession or control.[6]  See also *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214, 221 (1978), describing the Act as reaching "records and material in the possession of federal agencies. . . ."

The conclusion that possession or control is a prerequisite to FOIA disclosure duties is reinforced by an examination of the purposes of the Act.  The Act does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained.[7]  It has been settled by decision of this Court that only the Federal Records Act, and not the FOIA, requires an agency to actually create records, even though the agency's failure to do so deprives the public of information which might have otherwise been available to it.  *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132, 161–162 (1975); *Renegotiation Board* v. *Grumman Aircraft Engineering Corp.*, 421 U. S. 168, 192 (1975).

If the agency is not required to create or to retain records under the FOIA, it is somewhat difficult to determine why the agency is nevertheless required to retrieve documents which have escaped its possession, but which it has not endeavored to recover.  If the document is of so little interest to the agency that it does not believe the retrieval effort to be justified, the effect of this judgment on an FOIA request seems little different from the effect of an agency determina-

---

[6] See *Nolen* v. *Rumsfeld,* 535 F. 2d 890, 891 (CA5 1976) (suit "seeking production of missing records . . . is not within the purview of the Freedom of Information Act"), cert. denied, 429 U. S. 1104 (1977); *Nichols* v. *United States,* 325 F. Supp. 130, 137 (Kan. 1971) ("the Court may not require production of records not in [the] custody or control of an agency"), aff'd, 460 F. 2d 671 (CA10), cert. denied, 409 U. S. 966 (1972); *Ciba-Geigy Corp.* v. *Mathews,* 428 F. Supp. 523, 531 (SDNY 1977) ("[T]he government cannot be compelled to obtain possession of documents not under its control or furnish an opinion when none is written").

[7] Congress has imposed some very limited record-creating obligations with regard to indexing under the FOIA.  See 5 U. S. C. § 552 (a)(2).

tion that a record should never be created, or should be discarded.[8]

The procedural provisions of the Act, in particular, reflect the nature of the obligation which Congress intended to impose on agencies in the production of agency records. First, Congress has provided that agencies normally must decide within 10 days whether to comply with an FOIA request unless they can establish "unusual circumstances" as defined in the Act. 5 U. S. C. §§ 552 (a)(6)(A), (B). The "unusual circumstances" specified by the Act include "the need to search for and collect the requested records from field facilities and other establishments that are separate from the office processing the request." This exception for searching and collecting certainly does not suggest that Congress expected an agency to commence lawsuits in order to obtain possession of documents requested, particularly when it is seen that where an extension is allowable, the period of the extension is only for 10 days. Either Congress was operating under the assumption that lawsuits could be waged and won in 10 days, or it was operating under the assumption that agencies would not be obligated to file lawsuits in order to comply with FOIA requests.

A similarly strong expression of congressional expectations emerges in 5 U. S. C. § 552 (a)(4)(A) providing for recovery of certain costs incurred in complying with FOIA requests. This section was included in the Act in order to reduce the burdens imposed on the agencies. The agency is authorized to establish fees for the "direct costs" of "document search and duplication." The costs allowed reflect the congressional judgment as to the nature of the costs which would be incurred. Congress identified these costs, and thus the agency burdens, as consisting of "search" and "duplication." During

---

[8] This is not to suggest that this discretionary determination by the agency relieves it of other obligations imposed by the records management Acts. The observation goes only to the nature of the public right of access provided by the FOIA.

the enactment of the 1974 amendments to the FOIA, it was emphasized that agencies generally are not obligated to provide extensive services in fulfilling FOIA requests. S. Rep. No. 93–854, p. 12 (1974), reprinted in House Committee on Government Operations and Senate Committee on the Judiciary, Freedom of Information Act and Amendments of 1974: Source Book, 94th Cong., 1st Sess., 164 (Joint Comm. Print 1975) (hereinafter Source Book II). When agencies do provide additional services in conducting a search, they are clearly authorized to allocate that cost to the requester. *Ibid.* It is doubtful that Congress intended that a "search" include legal efforts to retrieve wrongfully removed documents, since such an intent would authorize agency assessment to the private requester of its litigation costs in such an endeavor.

It is therefore clear that Congress never intended, when it enacted the FOIA, to displace the statutory scheme embodied in the Federal Records Act and the Federal Records Disposal Act providing for administrative remedies to safeguard against wrongful removal of agency records as well as to retrieve wrongfully removed records. This result is buttressed by our decisions in *Renegotiation Board* v. *Bannercraft Clothing Co.,* 415 U. S. 1 (1974), and *NLRB* v. *Robbins Tire & Rubber Co., supra,* both demonstrating reluctance to construe the FOIA as silently departing from prior longstanding practice. *Bannercraft, supra,* of course held that Congress intended federal district courts to retain traditional equitable jurisdiction in adjudicating FOIA actions. But historic equitable practice has long recognized that an individual does not improperly withhold a document sought pursuant to a subpoena by his refusal to sue a third party to obtain or recover possession. *Amey* v. *Long,* 9 East 473, 482, 103 Eng. Rep. 653, 657 (K. B. 1808).

## C

This construction of "withholding" readily disposes of the RCFP and MAP requests. Both of these requests were filed after Kissinger's telephone notes had been deeded to the Li-

brary of Congress.[9]  The Government, through the Archivist,· has requested return of thè documents from Kissinger. The request has been refused. The facts make it apparent that Kissinger, and the Library of Congress as his donee, are holding the documents under a claim of right. Under these circumstances, the State Department cannot be said to have had possession or control of the documents at the time the requests were received. It did not, therefore, withhold any agency records, an indispensable prerequisite to liability in. a suit under the FOIA.

## III

The Safire request raises a separate question. At the time when Safire submitted his request for certain notes of Kissinger's telephone conversations, all the notes were still located in Kissinger's office at the State Department. For this reason, we do not rest our resolution of his claim on the grounds that there was no withholding by the State Department. As outlined above, the Act only prohibits the withholding of "agency records." We conclude that the Safire request sought disclosure of documents which were not "agency records" within the meaning of the FOIA.

Safire's request sought only a limited category of documents. He requested the Department to produce all transcripts of telephone conversations made by Kissinger from his White House office between January 21, 1969, and Febru-

---

[9] There is no question that a "withholding" must here be gauged by the time at which the request is made since there is no FOIA obligation to retain records prior to that request. This temporal factor has always governed requests under the subpoena power, *Jurney* v. *MacCracken*, 294 U. S. 125 (1935), as well as under other access statutes. See Fed. Rules Civ. Proc. 34, 45. We need not decide whether this standard might be displaced in the event that it was shown that an agency official purposefully routed a document out of agency possession in order to circumvent a FOIA request. No such issue is presented here. We also express no opinion as to whether an agency withholds documents which have been wrongfully removed by an individual after a request is filed.

ary 12, 1971, in which (1) Safire's name appeared; or (2) in which Kissinger discussed the subject of information "leaks" with General Alexander Haig, Attorney General John Mitchell, President Richard Nixon, J. Edgar Hoover, or any other official of the FBI.

The FOIA does render the "Executive Office of the President" an agency subject to the Act. 5 U. S. C. § 552 (e). The legislative history is unambiguous, however, in explaining that the "Executive Office" does not include the Office of the President. The Conference Report for the 1974 FOIA Amendments indicates that "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President" are not included within the term "agency" under the FOIA. H. R. Conf. Rep. No. 93–1380, p. 15 (1974), reprinted in Source Book II, p. 232. Safire's request was limited to a period of time in which Kissinger was serving as Assistant to the President. Thus these telephone notes were not "agency records" when they were made.

The RCFP requesters have argued that since some of the telephone notes made while Kissinger was adviser to the President may have related to the National Security Council they may have been National Security Council records and therefore subject to the Act. See H. R. Rep No. 93–876, p. 8 (1974), Source Book II, p. 128, indicating that the National Security Council is an executive agency to which the FOIA applies. We need not decide when records which, in the words of the RCFP requesters, merely "relate to" the affairs of an FOIA agency become records of that agency. To the extent Safire sought discussions concerning information leaks which threatened the internal secrecy of White House policy-making, he sought conversations in which Kissinger had acted in his capacity as a Presidential adviser, only.

Nor does his request for conversations in which his name appeared require a different conclusion. Safire never identi-

fied the request as implicating any National Security Council records. The request did not mention the National Security Council or any subject relating to the NSC. To the contrary, he requested to see transcripts Kissinger made from his White House office. Moreover, after the State Department denied the request on the grounds that these were White House records, Safire's appeal argued these were State Department records, again never suggesting they were NSC records. The FOIA requires the requester to adequately identify the records which are sought. 5 U. S. C. § 552 (a)(3)(A). Safire's request did not describe the records as relating to the NSC or in any way put the agency on notice that it should refer the request to the NSC. See 5 U. S. C. § 552 (a)(6)(B)(iii). Therefore, we also need not address the issue of when an agency violates the Act by refusing to produce records of another agency, or failing to refer a request to the appropriate agency.

The RCFP requesters nevertheless contend that if the transcripts of telephone conversations made while adviser to the President were not then "agency records," they acquired that status under the Act when they were removed from White House files and physically taken to Kissinger's office at the Department of State. We simply decline to hold that the physical location of the notes of telephone conversations renders them "agency records." The papers were not in the control of the State Department at any time. They were not generated in the State Department. They never entered the State Department's files, and they were not used by the Department for any purpose. If mere physical location of papers and materials could confer status as an "agency record" Kissinger's personal books, speeches, and all other memorabilia stored in his office would have been agency records subject to disclosure under the FOIA. It requires little discussion or analysis to conclude that the lower courts correctly resolved this question in favor of Kissinger. See also *Forsham* v. *Harris, post,* p. 169.

Accordingly, we reverse the order of the Court of Appeals compelling production of the telephone manuscripts made by Kissinger while Secretary of State and affirm the order denying the requests for transcripts produced while Kissinger served as National Security Adviser.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE BLACKMUN took no part in the decision of these cases.

MR. JUSTICE BRENNAN, concurring in part and dissenting in part.

Today's decision explores hitherto uncharted territory in a complicated statutory scheme. I cannot agree with what is to me the Court's crabbed interpretation of "improper withholding" under the Freedom of Information Act (FOIA). At the same time, I am not without some uncertainty about the contours of the "improper withholding" standard. Accordingly, although the result reached by my Brother STEVENS strikes me as the most workable for the present, I write separately to articulate some ideas on this difficult problem.

As an abstract matter, I concur in the Court's view that FOIA's reach should not be conditioned upon the legality of a documents transfer under the Federal Records and Records Disposal Acts. 44 U. S. C. § 2901 *et seq.;* 44 U. S. C. § 3301 *et seq.* (1976 ed. and Supp. II). These Acts establish a fairly comprehensive scheme for internal records management, one element of which is an administrative process for regulating and enforcing records disposal standards. Thus, the "legality" of a document transfer for purposes of the Records Acts is, in a practical sense, partly a matter of administrative discretion. Conceptually, it seems strange to import such a discretionary factor into the legal standards that govern

*private* rights of action under FOIA. And it is not surprising that the Records Acts and FOIA fail to mesh: The former scheme is evidently directed toward fostering administrative interests, while the latter is definitely designed to serve the needs of the general public. Consequently, the Records Acts either may fail to promote the interests embodied in FOIA, or may address concerns that are irrelevant to FOIA.[1]

Although I agree that the Records Acts cannot be neatly interpolated into FOIA, I part company with the Court when it concludes that FOIA does not reach records that have been removed from a federal agency's custody. If FOIA is to be more than a dead letter, it must necessarily incorporate some restraint upon the agency's powers to move documents beyond the reach of the FOIA requester. Even the Court's opinion implies—as I think it must—that an agency would be improperly withholding documents if it failed to take steps to recover papers removed from its custody deliberately to evade an FOIA request. *Ante,* at 155, n. 9. Beyond that minimal rule, I would think it also plainly unacceptable for an agency to devise a records routing system aimed at frustrating FOIA requests in general by moving documents outside agency custody with unseemly haste.

Indeed, I would go further. If the purpose of FOIA is to provide public access to the records incorporated into Government decisionmaking, see *Forsham* v. *Harris, post,* at 188 (BRENNAN, J., dissenting), then agencies may well have a concomitant responsibility to retain possession of, or control over, those records.[2] But, as with so many questions that

---

[1] For example, a document transfer may comport with the formal requirements of the Records Acts, and yet be motivated by the desire to avoid a pending FOIA request.

[2] This notion is not incompatible with *NLRB* v. *Sears, Roebuck & Co.,* 421 U. S. 132, 161–162 (1975), and *Renegotiation Board* v. *Grumman Aircraft Engineering Corp.,* 421 U. S. 168, 192 (1975), which held that FOIA does not compel agencies to write opinions where not otherwise required. FOIA neither compels the Government to conduct research

the Court must resolve, the difficulty is where to draw the line. We could hardly assume that Congress intended agencies to be prevented from surrendering all documents that might be of interest to requesters—so broad a rule would not only swamp the agencies with paper, but would also seem incompatible with the records management goals of the Records Acts. See S. Rep. No. 2140, 81st Cong., 2d Sess., 4 (1950). Perhaps the appropriate test would take into account the importance of specific records; it might also consider the length of time records would be held, and the historical frequency of requests for documents of a particular type. To suggest the elements of such a test, however, is to expose how ill-suited a court is to define them adequately. It is Congress which has the resources and responsibility to fashion a rule about document retention that comports with the objectives of FOIA.

Although one might hope that Congress will soon address this problem, we must decide the case currently before us. I have little difficulty concluding that records which should have been retained for FOIA purposes may be reached under FOIA even though they have already passed beyond the agency's control.[3] In the absence of an analytically satisfying standard for determining *which* records should be retained, however, it is necessary to resolve this case by looking to an approach that is currently practicable. My Brother STEVENS'

---

on behalf of private citizens, nor duplicates administrative law requirements of adequate explanation for Government action, see *id.*, at 191–192. What the Act does mandate is exposure of the research and explanations which the Government has chosen to memorialize; an agency's obligation to *retain* records, therefore, may be inferred from FOIA without contradicting the principle that agencies need not *create* records.

[3] This will not necessarily entail the agency's litigating against the third party in possession of the documents, as the Court suggests. Rather, the third party might be joined in the FOIA suit. Cf. *Renegotiation Board* v. *Bannercraft Clothing Co.*, 415 U. S. 1, 18–20 (1974).

position fairly fits this prescription. While turning an FOIA suit upon the Records Acts is, as I have recognized, conceptually problematic, the records statutes do formulate document retention criteria that are not unduly burdensome and that carry a congressional imprimatur.

Accordingly, I agree with MR. JUSTICE STEVENS' conclusion with respect to the "improper withholding" issue, and therefore dissent from Part II of the Court's opinion.

MR. JUSTICE STEVENS, concurring in part and dissenting in part.

As the Court recognizes, the requesters are entitled to prevail in this FOIA action if the State Department "has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'" *Ante,* at 150. The Court assumes, without deciding, that "agency records" have been requested and then concludes that no such records have been "withheld." The Court states, and I agree, that an agency cannot "withhold" documents unless it has either custody or control of them. It then goes on, however, to equate "custody" and "control" with physical possession, holding that FOIA is simply inapplicable to any "document which has been removed from the possession of the agency prior to the filing of the FOIA request." *Ibid.*[1]

I cannot agree that this conclusion is compelled by the plain language of the statute; moreover, it seems to me wholly inconsistent with the congressional purpose underlying the Freedom of Information Act. The decision today exempts documents that have been wrongfully removed from the agency's files from any scrutiny whatsoever under FOIA. It thus creates an incentive for outgoing agency officials to remove potentially embarrassing documents from their files in order to frustrate future FOIA requests. It is the creation

---

[1] The Court states that "[i]n such a case, the agency has neither the custody nor control necessary to enable it to withhold." *Ante,* at 150–151.

of such an incentive, which is directly contrary to the purpose of FOIA, rather than the result in this particular case,[2] that prompts me to write in dissent.

In my judgment, a "withholding" occurs within the meaning of FOIA whenever an agency declines to produce agency records which it has a legal right to possess or control. A determination that documents have been withheld does not end the inquiry, of course, for a court must still determine whether the withholding was "improper" for purposes of the Act. Thus, in my view, correct analysis requires us to confront three separate questions in the following order: (1) are any of the requested documents "agency records"? (2) if so, have any of them been withheld because they are in the *legal* custody of the agency? and (3) if so, was the withholding improper?

## I

Everyone seems to agree that the summaries of Dr. Kissinger's State Department telephone conversations[3] should be considered "agency records" subject to disclosure under FOIA if they were "agency records" under the definitions set forth in the Federal Records Act (FRA). The parties disagree,

---

[2] I do not mean to imply that there was any improper motive for Dr. Kissinger's removal of the documents in this case. Nor do I believe that the decision the Court reaches today will necessarily lessen the requesters' access to the information contained in the summaries of Dr. Kissinger's telephone conversations. Many, if not all, of the significant decisions reflected in those summaries are also reflected in other agency records, which are still in the State Department's possession. Also, it is not clear how many of the summaries, even if subject to FOIA, would be exempt from production because they contain either classified or purely personal information. See 5 U. S. C. §§ 552 (b) (1) and (b) (6).

[3] I agree with Part III of the Court's opinion that the summaries of Dr. Kissinger's telephone conversations when he was a Presidential adviser were not "agency records" subject to disclosure under FOIA when they were created and did not become "agency records" when they were later stored in Dr. Kissinger's files at the State Department.

however, as to the proper application of that Act to the facts of this case. The requesters argue that the summaries were "records" under the FRA because they were documents "appropriate for preservation" by the agency under 44 U. S. C. § 3301. Dr. Kissinger, on the other hand, argues that the summaries were personal papers which he could dispose of at will under the FRA and which were never subject to disclosure under FOIA. The Government takes an interme-diate position, arguing that the summaries, were "agency records" only to the extent that they contained significant information that was not reflected in other agency records.[4]

I cannot accept Dr. Kissinger's argument that the summaries are private papers. As the District Court noted, they were made in the regular course of conducting the agency's business, were the work product of agency personnel and agency assets, and were maintained in the possession and control of the agency prior to their removal by Dr. Kissinger.

---

[4] The Government argues that Dr. Kissinger had an obligation under the State Department's records management program to record permanently all oral "[d]ecisions, commitments, and discussions of any significance." 5 FAM § 423.2-1 (1974). Thus, he should have extracted all significant information pertaining to agency business from his telephone summaries and entered that information in the agency's permanent records. To the extent that he did not do so, the telephone summaries remain the sole written evidence of that information and thus should be considered "agency records." However, to the extent that Dr. Kissinger saw to it that the information was properly recorded elsewhere, the Government argues that the summaries became "non-record materials" which could be disposed of with the agency's permission. (The Government concedes that some nonrecord materials may be subject to disclosure under FOIA while in the agency's possession; it takes the position, however, that such materials are not subject to either the FOIA or the FRA after they have been relinquished.)

Because it believes that the degree of duplication between the summaries and records still in the agency's possession cannot be determined from the evidence presented in this case, the Government argues that a remand would be appropriate if the issue of whether the summaries were "agency records" must be decided.

They were also regularly circulated to Dr. Kissinger's immediate staff and presumably used by the staff in making day-to-day decisions on behalf of the agency. Finally, Dr. Kissinger himself recognized that the State Department continued to have an interest in the summaries even after they had been removed, since he had a State Department employee review them in order to extract information that was not otherwise in the agency's files. App. 248a. Under these circumstances, I find it difficult to believe that none of the summaries was "appropriate for preservation" by the agency. Thus, although a remand might be necessary, as the Government suggests, see n. 4, *supra*, to determine which summaries were agency records and which were not, it is clear that at least some of them fell within that category at the time Dr. Kissinger removed them from his files at the State Department.[5]

## II

The second question to be considered is whether the State Department continued to have custody or control of the telephone summaries after they were removed from its files so that its refusal to take steps to regain them should be deemed a "withholding" within the meaning of the Freedom of Information Act. As I stated at the outset, I do not agree with the Court that the broad concepts of "custody" and "control" can be equated with the much narrower concept of physical possession.[6] In my view, those concepts should be applied to

---

[5] The fact that extracts were not made until *after* the summaries had been transferred to the Library of Congress indicates that, even under the Government's view, some of the summaries must have been "agency records" at the time they were removed from the State Department. Moreover, during the course of the litigation Dr. Kissinger granted permission to the Archivist and the State Department to review the summaries in order to determine whether they should seek their return as "agency records" despite the existence of the summaries. Brief for Federal Parties 14, n. 11.

[6] The Court's reference to subpoenas is instructive. See *ante*, at 154. Under Rule 34 of the Federal Rules of Civil Procedure, a party is required

bring all documents within the *legal* custody or control of the agency within the purview of FOIA. Thus, if an agency has a legal right to regain possession of documents wrongfully removed from its files, it continues to have custody of those documents. If it then refuses to take any steps whatsoever to demand, or even to request, that the documents be returned, then the agency is "withholding" those documents for purposes of FOIA.

In this case, I think it is rather clear that the telephone summaries were wrongfully removed from the State Department's possession.[7] Under these circumstances, the State

---

to produce requested documents if they are within his "possession, custody or control." The same standard applies to subpoenas *duces tecum* issued under Rule 45, see 9 C. Wright & A. Miller, Federal Practice and Procedure § 2454, p. 425 (1971). In construing these Rules the courts have rejected a narrow physical-possession test, focusing instead on whether the subpoenaed party has a legal right to custody or control of the documents in question. See, *e. g., United States* v. *International Business Machines Corp.*, 71 F. R. D. 88, 91 (SDNY 1976); *Buckley* v. *Vidal,* 50 F. R. D. 271, 274 (SDNY 1970); 8 C. Wright & A. Miller, Federal Practice and Procedure § 2210 (1970). Thus, if this case involved compliance with a discovery request rather than an FOIA request, I doubt very much that the agency could justify its failure to produce the documents on the ground that the agency head had wrongfully removed them from the agency's physical possession just before the subpoena was served.

[7] Once Dr. Kissinger's argument that the summaries were private papers is rejected, it becomes clear that the Federal Records Act and Records Disposal Act were violated by the transfer of the papers to the Library of Congress. If the summaries were agency records, as the requesters argue, then the State Department could not properly relinquish them without obtaining the approval of the General Services Administration. Under the Records Disposal Act GSA's approval would be conditioned on a showing that the documents were no longer needed in the "transaction of its current business" and did not have "sufficient administrative, legal, research, or other value to warrant their further preservation by the Government." 44 U. S. C. §§ 3303, 3303a (1976 ed. and Supp. II).

If, on the other hand, the summaries could have been converted from "records" to "non-record materials" as the Government suggests, the State Department still would have been required to take steps prior to

Department's failure even to request their return [8] constituted a "withholding" for purposes of FOIA.

### III

The third and most difficult question is whether the State Department's "withholding" was "improper." In my view, the answer to that question depends on the agency's explanation for its failure to attempt to regain the documents. If the explanation is reasonable, then the withholding is not improper. For example, I would not find an agency's inaction improper in a case in which it simply did not know where the documents were located or had no interest whatsoever in retrieving them. The FOIA does not require federal agencies to engage in prolonged searches for documents or institute legal proceedings that will not yield any appreciable benefits to the agency.

On the other hand, if the agency is unable to advance a reasonable explanation for its failure to act, a presumption arises that the agency is motivated by a desire to shield the documents from FOIA scrutiny.[9] Thus, if the agency be-

---

relinquishing them to assure itself that all significant information had been properly extracted for inclusion in more formal State Department files. The fact that such steps were not taken until *after* the summaries had been deeded over to the Library of Congress makes their removal from the agency by Dr. Kissinger unlawful even under the Government's theory.

[8] The Archivist did make several requests for the documents. App. 99a–116a. The fact that Dr. Kissinger refused those requests, however, does not demonstrate that a similar request by the State Department would also have been refused.

[9] The Court recognizes that there might be situations where documents were removed from the agency in order to avoid FOIA requests and suggests that its strict "physical-possession" standard might be "displaced" under these circumstances, *ante*, at 155, n. 9. As a practical matter, however, the Court's suggestion provides little comfort to the intended beneficiaries of the Act. For, if an agency can make a sufficient response to a request by simply denying physical possession, it will be a rare case indeed

lieved or had reason to believe that it had a legal right to the documents and that the documents were still valuable for its own internal purposes and nevertheless did not attempt to regain them, its inaction should be deemed an improper withholding.

In this case the State Department refused the FOIA requests on the ground that the telephone summaries were not agency records and, in any event, were no longer within the agency's custody or control. By the time the FOIA actions were filed, there was substantial reason for doubting the Department's resolution of the first issue, inasmuch as the General Counsel of GSA had rendered a legal opinion that the documents were probably agency records and should be returned to the Government for proper archival screening.[10] Because of their very nature, there was also substantial reason for believing that, if they were agency records, the summaries would have to be considered valuable documents. Finally, the fact that the documents had been removed by the head of the agency shortly before the expiration of his term of office raised an inference that the removal had been motivated by a desire to avoid FOIA disclosure.

---

in which the ordinary citizen can overcome that denial by proof of improper motivation. Moreover, it would be unseemly to invite litigation and discovery into the subjective motivation of agency officials responsible for processing the flood of paper that threatens to engulf today's bureaucracy. Focusing attention on the agency's reason for not reacquiring the documents, rather than on the individual employee's motive for removing them in the first place, seems to me to be a preferable way of eliminating the incentive to transfer documents to avoid disclosure under FOIA.

[10] GSA, and in particular the Archivist, has supervisory responsibility over the various agencies' records management and disposal programs. See, e. g., 44 U. S. C. §§ 2904, 2906, 3102, 3302, and 3303a (1976 ed. and Supp. II). Thus, an opinion by GSA's General Counsel could be expected to give a more authoritative and impartial view of the technical issue of what constitutes an agency record than an opinion by the State Department's legal counsel, given after the documents had already been removed.

Under these circumstances, it is at least arguable that the continued inaction of the State Department, contrary to the views of the Archivist, was improper.

Accordingly, I believe the District Court had jurisdiction under FOIA to determine (a) whether the telephone summaries were in fact agency records and (b) if so, whether the State Department's failure to seek return of the documents was improper. The court's disposition of those issues seems to me to have been somewhat premature, however. Once the litigation began, the State Department changed its position and contended that it could not determine whether it should seek return of the summaries without first inspecting them. Pursuant to an agreement with Dr. Kissinger, the Department and the Archivist began the process of sifting through the records. That process had not yet been completed when the District Court handed down its decision. Because the agency's informed opinion of the documents' status and their value was in my view relevant to a determination of whether its actions were "improper," I think the court's order was premature. I would therefore remand to give the Government an opportunity to finish its examination of the documents.