**JUDICIAL WATCH, INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, Defendant.**

No. Civ.A. 95–133(RCL).

United States District Court, District of Columbia.

Dec. 22, 1998.

Larry Klayman, Washington, DC, for plaintiff.

Marina Utgoff Braswell, Asst. U.S. Attorney, Bruce R. Hegyi, Asst. U.S. Attorney, William Mark Nebeker, Asst. U.s. Attorney, U.S. Attorney's Office, Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

After four years, this case finally offers a light at the end of the tunnel. Currently before the Court is the apparently unprecedented situation in which the defendant Department of Commerce (DOC) has moved for entry of judgment *against itself*; the plaintiff, Judicial Watch, has vehemently *opposed* the motion. Unfortunately, this odd posture is not atypical of the extreme positions taken by the litigants in this case. After much deliberation and a thorough review of the extraordinary record in this case, the Court will deny the DOC's motion for entry of judgment, grant partial summary judgment, sua sponte, ordering DOC's proposed search, and allow further discovery under the rigorous supervision of a Magistrate Judge to explore the issue of unlawful destruction and removal of documents by the DOC.

## I. FACTUAL AND PROCEDURAL HISTORY

The agency search and subsequent litigation arising from plaintiff's several FOIA requests have, over the past four years, led to allegations of misconduct, minor and severe, both by counsel for the government and by counsel for the plaintiff, and to numerous motions for sanctions and for the initiation of contempt proceedings. For the purposes of today's decision, the Court is primarily concerned with the illegal destruction of documents and the illegal removal of documents from DOC custody in knowing violation of the FOIA and the orders of this Court. These particular actions, however, have not occurred in a vacuum.

To understand how this FOIA litigation could have deteriorated as drastically as it

has, it may be helpful to recognize that underlying plaintiff's FOIA requests is a political crusade to uncover what Judicial Watch believes to be a campaign finance scandal tenaciously concealed by the current presidential administration. Judicial Watch revealingly declares in its opposition to the DOC's motion for entry of judgment that "this case continues not only to be the primary, cutting-edge information source for the American people, it is also at the forefront of generating needed change in our political system." P.'s Opp. to Mot. to Enter Judgmt. at 56. Thus, at least in the plaintiff's eyes, the political stakes here are high. Furthermore, plaintiff counsel's fervor in the pursuit of this litigation appears to have been more than the government's attorneys could handle. The animosity, for lack of a better word, between the attorneys for the DOC and for Judicial Watch has simmered throughout this litigation, and the misconduct of counsel may be understood in part as the boiling over of a personal, as well as political, battle.

Even before this litigation was commenced, however, the DOC appears to have demonstrated a disregard for the law that cannot be explained even by the idiosyncracies of Judicial Watch's counsel. Either out of carelessness or deliberate defiance, the DOC repeatedly and grossly mishandled materials responsive to Judicial Watch's FOIA requests. Whether the agency had political motivations for its misconduct is a question largely irrelevant to this Court's task today.

The DOC has moved the Court to enter judgment in favor of Judicial Watch, essentially conceding that the search it performed in response to the plaintiff's FOIA requests was unreasonable and unlawful. Almost ironically, the DOC's motion must be denied, not because the evidence fails to establish that the government's conduct was unreasonable, but because the record of misconduct in this case is so egregious and so extensive that merely granting the DOC's motion and ordering a new search would fail to hold the agency fully accountable for the serious violations that it appears to have deliberately committed.

Although a full account of the DOC's misconduct in this case will likely be made at some point, it is not necessary to today's decision. Consequently, the following narrative will be limited to a chronology of Judicial Watch's FOIA requests and the procedural stages of this litigation, as well as more detailed descriptions of events specifically relating to the mishandling of documents. The Court does note that the destruction and discarding of responsive documents comprises just one aspect of the unreasonableness of the DOC's search; however, for reasons explained in detail in Part II, below, this particular misconduct is central to a proper understanding of why merely entering judgment and granting a de novo search, as the DOC requests in its motion, would unjustly prevent the plaintiff from pursuing the full extent of relief available to it under the law.

### A. Plaintiff's FOIA Requests

Sometime in 1994, Judicial Watch, a conservative public interest group, began to suspect that the Clinton administration was engaged in illegal campaign fundraising, including the exchange of seats on Department of Commerce foreign trade missions for political donations to the Democratic National Committee (DNC). After obtaining a DNC brochure that purported to offer participation in foreign trade missions as one of several benefits available to Managing Trustees of the DNC, a membership level requiring annual donations of $100,000, Judicial Watch filed two initial FOIA requests with the DOC. On September 12, 1994, Judicial Watch requested the release of all documents relating to Commerce Secretary Ron Brown's 1994 trade missions to China and South Africa. The following day, September 13, 1994, Judicial Watch filed another request with the DOC, reiterating the September 12 request and expanding it to also include all documents relating to trade missions to the former Soviet Union in March and April of 1994 and to South America in June and July of 1994.

One month later the hostilities began in earnest. On October 18, 1994, counsel for Judicial Watch, Larry Klayman, received a telephone call from Melissa Moss, Director of

the DOC Office of Business Liaison. According to Klayman, Moss tried to pressure him into withdrawing or substantially narrowing Judicial Watch's requests, which he refused to do. Upon his refusal, Klayman alleges, Moss angrily hung up on him.

On October 19, 1994, Moss wrote to Klayman to "confirm" their October 18 conversation. Moss claimed in her letter that Klayman had "reformulated" Judicial Watch's request to be somewhat narrower. That same day (the correspondence was by facsimile) Klayman responded that he had agreed to no such reformulation and asked that Moss "refrain from any further misstatements of [Judicial Watch's] position." Moss apparently did not respond.

Also on October 19, 1994, Judicial Watch filed its third FOIA request with DOC, this one relating to a trade mission to India scheduled for late 1994.[1]

### B. *Plaintiff's FOIA Action and Defendant's First Motion for Summary Judgment*

Having received no response to its initial requests from the DOC, on January 19, 1995, Judicial Watch filed this action to compel the DOC to comply with its FOIA requests. In response, the DOC claimed that Judicial Watch would have to pay some $13,000 in photocopying and processing costs before DOC would release the responsive information. When Judicial Watch requested a public interest fee waiver, the DOC refused until, on May 16, 1995, this Court ordered that the costs be waived and the responsive documents released to Judicial Watch.

The next day, May 17, 1995, the DOC released some 28,000 pages of documents responsive to Judicial Watch's requests; it withheld over one thousand other documents in whole or in part, invoking several of the statutory exemptions set forth in the FOIA. Judicial Watch, unsurprisingly, was not satisfied that the 28,000 pages included all responsive documents. In particular, plaintiff noted that the released documents contained no documents from Secretary Brown, nor from the White House or the DNC. According to Judicial Watch, suspiciously little correspondence to and from trade mission participants was included, as well.

Upon the request of the parties, this Court received for *in camera* inspection all documents withheld pursuant to Exemption 5 of the FOIA. Before the Court had completed it review, however, the DOC filed its first *Vaughn* index and moved for summary judgment. On February 1, 1996, this Court denied the DOC's motion for summary judgment because the *Vaughn* index was insufficient to support judgment as a matter of law. The Court also ordered discovery on the issue of the adequacy of the agency's search for documents, and ordered the DOC to submit a revised *Vaughn* index.

### C. *Defendant's Second Motion for Summary Judgment*

In April of 1996, the DOC submitted a revised Vaughn index and affidavits in support of a second motion for summary judgment. At a hearing on August 7, 1996, the Court denied the motion for summary judgment as to the adequacy of the DOC's search and ordered further discovery as set forth in a memorandum and order dated August 30, 1996.

---

1. Two years later, Judicial Watch would file a fourth request on June 10, 1996, requesting documents related to the 1996 trade mission to Bosnia and Croatia. Later requests in October and November of 1996 would ask for documents relating to trade missions to numerous other countries in the Far East, the Middle East, Europe, Africa, and Latin America. Yet another request in June 1997 would seek all documents produced by DOC at the request of any investigative body from June 1996 to June 1997.

Although these other FOIA requests are not at issue in this action, the related subjects of the requests suggests that one all-encompassing search might prove more efficient than separate searches. Therefore, although the government is by no means required to conduct a search with all of the safeguards ordered today in every case, the parties are encouraged to explore among themselves the possibility of including these various other requests in the procedure ordered today for the initial three requests and thus resolve other pending actions and disputes, The Court will schedule a status conference in the other pending actions to be conducted promptly after issuance of today's decision.

On September 5, 1996, the Court issued a decision granting in part and denying in part the remainder of the DOC's motion. The Court found that 153 of the 306 documents withheld under Exemption 5 were improperly withheld in whole or in part, and ordered their release to Judicial Watch. Nevertheless, the Court granted summary judgment in favor of the DOC as to all other withheld documents.[2]

### D. Initial Discovery—1996

Meanwhile, Judicial Watch had begun discovery designed to explore the adequacy of the DOC's documents search. Gradually that discovery begin to reveal evidence that the DOC had illegally destroyed and removed from its custody responsive documents, apparently in an attempt to circumvent the disclosure requirements of the FOIA and the orders of this Court.

### 1. Ron Brown, Secretary of Commerce

On February 27, 1996, Judicial Watch noticed the deposition of Secretary of Commerce Brown, to be held on March 28, 1996. On March 14, 1996, Secretary Brown, in a sworn declaration, claimed not to be in possession of any documents responsive to plaintiff's FOIA requests, and also claimed to have played no role in determining the scope of the DOC's search, assertions which were cast in doubt by subsequent testimony. The Secretary's deposition was stayed temporarily to permit discovery from other DOC personnel, in an effort to avoid interfering with the Secretary's schedule unless other avenues of discovery proved inadequate. On April 3, 1996, Secretary Brown was killed in a plane crash during the trade mission to Bosnia and Croatia. Had he lived, he may have been able to respond to questions raised by the subsequent testimony of his business partner and confidante Nolanda Hill (discussed below).

In any event, the events that transpired in his office after the news of his untimely death arrived in Washington would themselves later be a focus of Judicial Watch's discovery efforts. Subsequent depositions revealed a flurry of document shredding in the Secretary's office, as well as easy access to the office by the Secretary's family and coworkers, which lend plausibility to Judicial Watch's claims that documents were unlawfully removed and destroyed after the Secretary's death.

The plausibility of Judicial Watch's claim is further strengthened by the deposition testimony of several DOC employees which confirms that the documents destroyed or removed from the Secretary's office were never searched in response to Judicial Watch's FOIA request. Anthony Das, who was represented as responsible for overseeing the document search in the Secretariat and other offices, testified in his March and October depositions that in fact he had only a minimal role in the DOC's document search and that he never discussed the search with Secretary Brown, nor was he aware of any search for documents in the Secretary's office. Brenda Dolan was similarly represented to have first-hand knowledge of the DOC's document search, and yet at her deposition she also testified that her involvement in the search was minimal; she never discussed the search with Secretary Brown or anyone in his office, nor did she personally search for documents there, nor did she review documents found by others. Barbara Schmitz and Melanie Long, both close assistants to the Secretary, testified that Secretary Brown's office was never searched and that, after his death, various people were allowed access to the Secretary's office and documents from the office were destroyed without being searched for materials responsive to plaintiff's FOIA request. The Secretary's Chief of Staff, Robert Stein, even corroborated the testimony that Secretary Brown's office was never searched for documents. From this evidence, it is indisputable that the DOC destroyed and possibly removed documents that, at best, were not searched in response to Judicial Watch's requests. This alone would likely support a finding that the agency's document search was unreasonable, but

---

**2.** The Court granted Judicial Watch's motion to reconsider this decision on March 31, 1998. After reviewing *in camera* all of the withheld materials, the Court will reinstate the September 5 order by separate order issued this date.

it is just one piece of this unsightly puzzle, and subsequent deposition testimony would uncover actions by the DOC that strongly substantiate the claim that the agency was deliberately destroying and jettisoning documents.

### 2. Ira Sockowitz, Special Assistant to the DOC General Counsel

At his October 28, 1996 deposition, Ira Sockowitz testified that, when he left the DOC for a job at the Small Business Administration (SBA), he took with him numerous documents, including classified materials and documents responsive to Judicial Watch's FOIA requests. *See* Sockowitz Video Depo. at 5:01–08. In response to this and other revelations at Sockowitz's deposition, the Court ordered the Inspector General of the SBA to take custody of Sockowitz's computer and safe for an inventory and search. This process revealed not only documents responsive to Judicial Watch's FOIA requests, but also sensitive classified information concerning national security matters, including telecommunications technology information on several countries to which the DOC had sent trade missions. According to the testimony of Sockowitz's supervisor, Ginger Lew, these documents were of no use to Sockowitz in his duties at the SBA, *see* Lew Video Depo. at 4:14, 4:53–54, and their removal has never been adequately explained.

### 3. John Huang

John Huang was Deputy Assistant Secretary for International Economic Policy at the DOC under Secretary Brown before leaving to become Vice Chairman of the DNC. In October 1996, when the Court authorized Judicial Watch to take his deposition, Huang literally went into hiding to avoid service of the subpoena. His family, his coworkers at the DNC, and even his attorney claimed not to know his whereabouts, although others claimed to see him regularly. Only when this Court demanded that counsel for the DNC produce Huang for service of process

did he finally "resurface" to accept the subpoena.

At his October 29, 1996 deposition, Huang gave what can at best be termed questionable testimony. He testified that he participated in neither trade missions nor fundraising while at the DOC, and he claimed to have kept few records during his tenure there. *See* Huang Depo. at 182–82, 190–92. He produced no records at the deposition. Subsequent media accounts, however, portray him as a pack-rat who left the DOC with "bulging files." James Bennett, *For Democrats, All Kinds of Answers*, N.Y. Times, Dec. 30, 1996, at A11. Whether these files contained responsive documents is anyone's guess.

Huang further testified that he played an insignificant role overall at DOC, as little more than a "budget clerk." Subsequent discovery has also made this portrayal incredible. From his own testimony, he appears to have participated in planning trade missions, *see* Huang Depo. at 177–78, communicated frequently with businesspeople overseas and in the United States, and participated in policymaking meetings, *see id.*, and he received intelligence briefings on nearly forty occasions. Copies of some of Huang's correspondence, released by the DNC, also appears to support a vision of Huang as something more than merely a "clerk."

Among other discoveries, Judicial Watch later learned that Huang kept a detailed desk diary while at DOC, tracing his activities on a daily, even hourly, basis. *See* Stewart Video Depo. at 10:59–11:00. When faced with Judicial Watch's demands that this diary be released, the DOC turned over to Klayman a partially illegible copy of the manuscript. Despite ongoing demands, and without reasonable explanation, a legible copy of the diary still has not been made available to Judicial Watch.[3]

In short, John Huang may well have removed responsive documents from the DOC when he left, just as Ira Sockowitz did. His testimony suggesting otherwise is not credi-

---

3. The Attorney General, who is now in possession of the desk diary for purposes of an investigation, will be ordered to provide Judicial Watch with a legible copy in another, separate decision issued today.

ble; in fact, little of his deposition testimony is particularly credible, in light of the evidence now available. Plaintiffs are entitled to explore this issue further, and continued discovery on the subject will be authorized in order accompanying this opinion.

### 4. Dalia Traynham

Secretary Brown's scheduler, Dalia Traynham, testified at her November 26, 1996 deposition that she was asked by Barbara Schmitz and Melanie Long to shred documents after Secretary Brown's death in April of 1996, although she had never shredded documents before at DOC. *See* Traynham Video Depo. at 3:01–07. Judicial Watch speculates that the assignment was intended to "wash the hands" of other DOC employees should questions later be asked.

### 5. Melinda Yee

Melinda Yee held various positions at the DOC and went on several trade missions. At her deposition on December 2, 1996, she testified that she took notes during the China trade mission. *See* Yee Depo. at 144, 154–55, 160, 208–212. She also testified to destroying these notes, *see id.* at 160–61, 168–71, 208–09, 212, many of which were responsive to plaintiff's FOIA requests and had been specifically ordered produced by this Court on August 30, 1996. No adequate explanation has been given as to why these documents were destroyed, and Judicial Watch can hardly be blamed for suspecting a lack of good faith on the part of DOC, particularly given the somewhat amazing fact that this and other improper actions have never been investigated by the Inspector General of the DOC.

At a hearing held February 3, 1997, the DOC urged the Court to limit Judicial Watch's discovery. The Court denied the request as groundless. The Court stated in its February 13, 1997 order that plaintiff's discovery process could hardly be called a "fishing expedition" because so many of the depositions had led to critical discoveries re-

garding mishandling of documents and other misconduct by the DOC. Seemingly everywhere Judicial Watch looked, there lurked some piece of DOC dirty laundry. Although only later would the Court surmise the probable source of Judicial Watch's "tips," it was apparent by early 1997 that the adequacy of the DOC's search had been cast in serious doubt and that further discovery was warranted to explore to what degree the DOC had failed to reasonably search for responsive documents and whether its inadequate efforts were the result of carelessness or something worse.

### E. *Further Discovery Revelations—1997*

Throughout 1997, Judicial Watch continued to take depositions of DOC employees and former employees. With virtually every question answered, new questions arose, as did more information pointing to illegal destruction and removal of responsive documents by the DOC.

### 1. David Rothkopf

Former DOC Deputy Undersecretary David Rothkopf was deposed on April 1, 1997. In yet another display of the DOC's unique approach to FOIA, essentially identical to the actions of Sockowitz and Huang, Rothkopf removed a substantial number of documents from the DOC when he left the Department to return to the private sector, where the documents presumably would be beyond the reach of Judicial Watch or other curious parties. The Court ordered the DOC to retrieve these materials, and responsive documents were in fact found and some produced to Judicial Watch.[4]

### 2. DNC Minority Donor List

The first "smoking gun" document revealed by Judicial Watch's discovery was uncovered in May 1997. Although this responsive document was eventually disclosed, and there is no compelling evidence that the DOC attempted to destroy or jettison the list, this episode is important as a milestone and as an

---

4. Incidentally, these and many other documents discovered since the DOC's initial motion for summary judgment have never been the subject of a motion for summary judgment, and respon-

sive documents found but not released have not been accounted for in supplemental *Vaughn* indices. This is yet another obstacle to granting the DOC's motion for entry of judgment.

illustration of the DOC's approach to its duties under the FOIA.

### a. *Deposition of Graham Whatley*

Graham Whatley, assistant to Deputy Assistant Secretary Jude Kearney, was deposed on May 28, 1997. At that deposition, Whatley made the dramatic revelation that a list of 139 minority donors to the DNC was kept in the files of Deputy Assistant Secretary Kearney, who was in charge of selecting participants for the trade missions. This statement was in direct contradiction to the deposition testimony of Kearney, who had testified that he was not in contact with the DNC and was unaware that any trade mission participants had made contributions to the DNC. Judicial Watch demanded that the obviously responsive donor list be immediately produced, and within a few hours the Department of Justice sent a copy by facsimile directly to the site of the deposition. Judicial Watch later learned that several of the donors on the list in fact participated in trade missions.

Whatley was apparently demoted after his May 1997 deposition. Although the Court has no evidence of retaliation by the government, the implications of the timing are hard to ignore.

### b. *Deposition of John Ost*

Two days after Whatley's testimony revealing the existence of the DNC minority donor list in Kearney's files, John Ost testified that he had received a facsimile from the Democratic National Committee listing companies that the DNC was recommending for participation in trade missions. *See* Ost Video Depo. at 11:08–10. Ost testified that he had turned this document over to his superiors as responsive to Judicial Watch's FOIA request, *see id.,* but the document was never released.

### c. *Deposition of Christine Sopko*

On July 2, 1997, Judicial Watch deposed Christine Sopko, secretary to Jude Kearney. Sopko testified that she had in fact turned over a copy of the DNC minority donor list to DOC lawyers months before the existence of the list was revealed at Graham Whatley's

deposition. Ms. Sopko appeared upset at times during her deposition; Judicial Watch suggests that she was afraid that she would be fired as Whatley had been after his deposition, although she denied as much at the deposition.

### d. *DOJ's Explanation*

The DOC and the DOJ do not claim that the DNC minority donor list from Kearney's files is not responsive to Judicial Watch's FOIA request. Moreover, it appears that the document was in fact found and disclosed to AUSA Shoaibi and DOC counsel, including Judith Means of the DOC Office of General Counsel, and yet it was not released to Judicial Watch until after its revelation at the Whatley deposition. Judicial Watch, of course, suggests that the DOC and its attorneys deliberately withheld the list in blatant violation of the FOIA and the orders of this Court.

The DOC and the United States Attorney's Office (USAO–DC), however, offered their own explanation for the nondisclosure of the minority donor list in papers filed on May 29, 1997 and July 3, 1997. Initially, the May 29, 1997 "notice to the court" stated that the existence of the minority donor list "was a surprise to the USAO–DC and to the agency counsel present at the [Whatley] deposition." The notice, apparently prepared by Assistant United States Attorney Bruce Heygi, represented that the matter was being referred to the Inspector General of the DOC for investigation and also brought to the attention of the Public Integrity division of the DOJ, although the Court has yet to be informed of the results of any investigation, or even notified that one has been opened. Counsel for the DOC repeated essentially this same position at a status conference on June 27, 1997.

However, a little more than one month after the first "notice to the court," and just days after the June 27 status conference, the deposition testimony of Ms. Sopko revealed that she had discussed the existence of the donor list with DOC counsel, including AUSA Shoaibi and Judith Means of the DOC Office of General Counsel, *months* before the What-

ley deposition. In the face of this revelation, the AUSO–DC changed its tune.

In its July 3, 1997 supplemental notice to the Court, the USAO–DC offered a different explanation for its failure to produce the DNC minority donor list. According to the USAO–DC, its admitted failure to disclose the donor list was the result of oversight and miscommunication, not willful defiance. Due to the burdensome number of depositions scheduled by Judicial Watch around the time of Mr. Whatley's deposition, the USAO–DC assigned another AUSA, Alexander Shoaibi, to assist AUSA Heygi with this litigation. When AUSA Shoaibi met with Christine Sopko on April 1, 1997 to prepare for her deposition, Sopko revealed to him that the minority donor list had been found among Kearney's papers. AUSA Shoaibi apparently did not consider this revelation significant, and he allegedly did not communicate it to AUSA Heygi, who was at that time bogged down in other day-long depositions scheduled by Judicial Watch.

The USAO–DC claims that, when Mr. Whatley disclosed the existence of the donor list at his May 28, 1997 deposition, "AUSA Shoaibi simply did not recall (and AUSA Heygi did not know)" that Sopko had revealed the existence of the list to Shoaibi two months earlier. Sopko's mention of the list did not "reoccur" to Shoaibi, according to the USAO–DC, until the night before Sopko's July 2 deposition, when Shoaibi reviewed his notes from the preparation session. This despite the obvious responsiveness of the document and its clear significance as the most incriminating document that Judicial Watch had found to date in this FOIA litigation. In an attempt to rectify the situation, the DOC waived the attorney-client privilege at Sopko's July 2, 1997 deposition and allowed Judicial Watch to question her regard-

ing her revelation of the donor list at the April 1, 1997 preparation session.

Even if the behavior of the United States Attorney's Office could be attributed to gross carelessness, no acceptable explanation has been offered for the behavior of the DOC Office of General Counsel. Testimony shows that Judith Means was present when Ms. Sopko revealed the existence of the donor list at her deposition preparation session, and Ms. Means, who apparently has worked on this case from its early stages, could not possibly have been unaware of the importance of the list. Nevertheless, according to the representations of AUSA Heygi, Ms. Means apparently denied any knowledge of the list at the Whatley deposition and allowed the USAO–DC to file a notice with this Court indicating that the list was a "surprise" to both AUSA Heygi and herself. Ms. Means' failure, and the corresponding failure of her office, to reveal the existence of the donor list in the *months* before Graham Whatley's deposition is certainly among the most egregious abuses that have occurred in this litigation, and Ms. Means' stubborn refusal to admit her complicity in the nondisclosure only aggravates the matter.

In addition to the mishandling of the situation by DOC counsel, which is just one of the many episodes of attorney misconduct in this case that will likely be discussed in subsequent opinions, the nondisclosure of the donor list raises troubling inferences regarding the DOC's conduct of the search. Apparently, DOC employees in fact discovered the list and another similar document and properly turned the documents over to their supervisors,[5] but the responsive documents were nevertheless illegally withheld. The implication, strengthened by the pattern of abuse in this case, is that those DOC employees responsible for supervising and coordinating the document search were manipulating the

---

5. It appears that the DNC donor list was not found during the DOC's initial document search, but instead was found during a subsequent search undertaken in response to a congressional subpoena. It is not clear, therefore, which employees and officials at the DOC were aware of the list's discovery and also aware that it would be responsive to Judicial Watch's FOIA requests and this Court's orders. In any event, the donor list was found in the files of Deputy Assistant

Secretary Kearney, where it clearly *should* have been found and processed during the FOIA document search, and the document was in fact disclosed to attorneys for the DOC and USAO–DC months before its discovery at the deposition of Mr. Whatley. Had the questioning by counsel for Judicial Watch failed to identify the list at that deposition, the Court can only assume that it would remain unproduced, despite its clear responsiveness to Judicial Watch's requests.

search and withholding potentially damaging documents. At this stage, it is still unclear to what extent such illegality occurred, precisely who was responsible, and to what extent the DOC used the destruction and removal of documents to conceal its efforts to thwart the FOIA and circumvent this Court's orders. The supervised discovery authorized in today's order will allow Judicial Watch to explore this latter issue in detail.

### F. Continuing Discovery and Responses from the DOC

Emboldened by the discovery of the minority donor list, Judicial Watch spent the second half of 1997 taking further depositions to explore the extent to which the DOC search may have been manipulated, and what, if any, other documents were illegally withheld. Through this discovery, it was gradually revealed that classified information had been mishandled by various DOC employees. The DOC, for its part, appeared to be setting a new and encouraging course, but an awards ceremony in December demonstrated that its priorities lay elsewhere.

#### 1. Mishandling of Classified Information

At his deposition on June 10, 1997, Jeffrey May, who replaced Ira Sockowitz as Special Assistant to the DOC General Counsel, testified that he had allowed Sockowitz access to a safe in the Special Assistant's office after Sockowitz left the DOC. See May Video Depo. at 11:30–31. This testimony apparently corroborated testimony from Sockowitz that he had removed classified documents, including responsive documents and other materials relating to satellite technology and national security information, from the office after his departure. See Sockowitz Video Depo. at 5:01–08.

The deposition testimony of Laurie Fitz–Pegado, former DOC Director of the Foreign Commercial Service, was taken on July 18, 1997 and August 1, 1997. That testimony revealed that Fitz–Pegado and a number of other DOC employees with access to top secret information at the DOC left the Department for positions at a company involved in the development of a global cellular telephone satellite network. See 7/18/98 Fitz–Pegado Video Depo. at 11:02–08. Judicial Watch points out that the company is apparently owned in part by state-owned entities in China, Russia, and India, the very countries which were the subject of classified intelligence data taken by Ira Sockowitz when he left the DOC to go to the SBA. Judicial Watch suggests that this "connection" shows an additional motive for the illegal removal of classified documents from DOC.

#### 2. DOC's Motion for Entry of Judgment

On August 12, 1997, the DOC filed its motion for entry of judgment. As motivation for its unusual motion, the DOC cited the considerable expense already undertaken in defense of this action and a desire "to promote the general public interest of confidence in Government." As amended, the DOC's order proposes a rigorously supervised new search, as well as the award of reasonable attorney's fees and costs to Judicial Watch. At the time, the proposed new search and the reference to promoting confidence in government appeared to the Court to signal a renewed good faith on the part of the DOC, its new Secretary, and its new General Counsel. Nevertheless, Judicial Watch fiercely opposed the motion, which it considered an offer to "sell out." The interesting legal questions raised by the motion and by the unusual stances of the parties are discussed in Part II of this memorandum opinion.

#### 3. Howard University's "Ron Brown Collection"

On October 16, 1997, the DOC revealed that in February of 1997 it had allowed the removal from DOC headquarters of literally thousands of photographs and video and audio tapes of trade missions led by Secretary Brown. The DOC claimed that the materials were to be made part of a "Ron Brown, Jr. Collection" at Howard University. The University never corroborated those claims, and Judicial Watch alleges that no such collection exists.

The DOC agreed to produce these materials to Judicial Watch and was forced to retrieve them from Howard University because

it could not be determined how many of the documents represented the only existing copy. In any event, the materials were eventually made available to Judicial Watch for inspection at the DOC. Although Judicial Watch initially demanded copies of the documents, rather than merely access to them, the Court will decide in a separate decision issued this date that access to the materials satisfied the DOC's obligations with regard to this information. Despite the satisfactory resolution of this matter, the Court fails to understand why the DOC would give away its only copies of materials subject to a court order.

### 4. DOC Awards

On December 2, 1997, the DOC held an awards program for its employees. In stark contrast to the good faith and reasonableness shown in the agency's motion for entry of judgment, the DOC *handed out medals* to several of the employees who were instrumental in DOC's document search, which by all indications was ridden with conduct that was grossly careless at best and in blatant violation of the law at worst. The Court invited an explanation from the DOC, but none was offered. The Court is at a loss as to how the DOC could go so far as to reward employees for conduct that in the most forgiving light strongly resembles defiance of federal statutes and the orders of the federal courts.

### G. *Nolanda Hill*

The highest drama in this litigation was supplied by Nolanda Hill, former business partner and confidante of Secretary Brown:

On January 28, 1998, Hill submitted under seal a sworn declaration detailing her knowledge of the Department of Commerce's handling of Judicial Watch's FOIA requests, information that she allegedly obtained through her relationship with Secretary Brown. Stating that she was concerned about retaliatory actions by the government,

Hill requested that the Court provide mechanisms for her protection. Pursuant to that request, the Court ordered that the affidavit be initially kept under seal and saw to it that her attorney was made aware of the situation and was willing to represent and protect her interests in this matter. An evidentiary hearing was then scheduled for March 23, 1998.

On March 14, 1998, Hill was indicted on criminal charges. Although an investigation had been underway before Hill offered to testify in this case, Judicial Watch claims that the government had represented to Hill that charges would not be filed, and that the March 14, 1998 indictment was in retaliation for her cooperation with Judicial Watch.

On March 23, 1998, Hill appeared before this Court and gave extensive testimony as to her knowledge, gained from communications with Secretary Brown, relating to this action.[6] Upon examination by Mr. Klayman, Hill testified that the Secretary told her that White House officials had actually instructed him to delay the production of documents responsive to Judicial Watch's requests and to come up with a way to avoid compliance with this Court's orders. *See* Transcript of March 23, 1998 Hearing at 85. Hill vividly recalled the Secretary's comment that Leon Panetta (then White House Chief of Staff) had urged him to "slow pedal" the document search. *See id.* at 85–86. According to Hill, this message was conveyed to Secretary Brown by Panetta and by John Podesta (then White House Deputy Chief of Staff) on several occasions. *See id.* at 85–88.

In her role as personal advisor and confidante to Secretary Brown, Hill allegedly offered to review the most sensitive documents responsive to Judicial Watch's request, for the purpose of finding out precisely what was involved and, according to Hill, to encourage the Secretary to turn over all responsive documents. *See id.* at 88. Hill never did review the material, however, and she was unable to testify as to whether such a collec-

---

**6.** Hill's testimony included some information directly relating to the involvement of White House, DNC, and DOC officials in the alleged sale of trade mission seats as part of Democratic fundraising, which is of course the ultimate tar- get of Judicial Watch in this case. However, these larger issues are not before the Court, and therefore this narration of Hill's testimony will focus solely on that information relating to DOC's response to plaintiff's FOIA requests.

tion of "the most sensitive" responsive documents was ever assembled. *See id.* at 89–90.

Ms. Hill did testify to seeing several unproduced responsive documents in the Secretary's possession in 1996, shortly before the Secretary's death. According to Hill's testimony, she met with Secretary Brown at a hotel early in 1996, and on that occasion. the Secretary showed her a one-inch-thick packet of documents that he produced from a personal portfolio-type carrying case. *See id.* at 38–39. The Secretary told Hill that the documents had been retrieved from DOC files during the document search for Judicial Watch's FOIA requests. *See id.* at 39. Hill reviewed the top five or six documents, confirming that they were copies of letters from Melissa Moss to trade mission participants specifically referencing their donations to the DNC, clearly responsive to Judicial Watch's requests. *See id.* at 40–41. Needless to say, these documents had not been, and have not since been, released to the plaintiff. Their current location is unknown, perhaps unknowable, although Judicial Watch argues that the evidence supports an inference that the documents were either destroyed during the flurry of document shredding following the Secretary's death, or removed from his office during that same time period. In any event, Hill's uncontroverted testimony is strong evidence that the DOC illegally withheld documents from Judicial Watch in violation of the FOIA. It is also apparent that the DOC was aware of this Court's orders that all responsive documents be produced, and willfully defied those orders, according to Ms. Hill's testimony. This conduct alone would seem to justify entry of judgment against the DOC, and yet it simultaneously precludes such judgment until the extent of the DOC's unlawful behavior is adequately explored.

Also relevant to this action is the testimony of Ms. Hill that the deposition of Melissa Moss contained a number of inaccuracies. *See id.* at 105 et seq. In addition, revelations about Moss's role in the orchestration of the trade missions casts her deposition testimony in a new light, and also raises doubts as to

how the activities in which she participated could have produced no documents responsive to Judicial Watch's requests. As a whole, the evidence supports an inference that Moss played an important role in resisting Judicial Watch's FOIA requests, and the testimony of Nolanda Hill points in particular to Moss as directly responsible for knowing violations of this Court's orders.[7]

On April 29, 1998, a superseding indictment was issued against Ms. Hill. Judicial Watch claims that it was intended as a further signal to keep quiet.

### H. *Action and Inaction by the DOC*

The months since Ms. Hill's testimony have produced relatively few startling discoveries. More troubling, perhaps, than any action taken in this time is the continued lack of action by the DOC to investigate its own conduct in this FOIA response and litigation.

#### 1. The Government's Failure to Investigate

To the best of this Court's knowledge, Nolanda Hill has never been questioned by anyone from the Department of Commerce, Department of Justice, Federal Bureau of Investigation, or other agency with investigative duties, despite wide publicity of her testimony before this Court. According to Judicial Watch, few of the more than forty officials deposed by it for this lawsuit testified that they had been approached in connection with any investigation of these matters. It appears that the DOC Office of the Inspector General has undertaken no investigation of the response to Judicial Watch's FOIA requests (although in light of the awards given to involved officials, this is hardly surprising). Although there was some speculation in the press following Nolanda Hill's testimony that the Attorney General might seek an independent counsel to inquire into campaign finance matters, including the alleged sale of trade mission seats, no such investigation has been con-

---

**7.** Consistent with its earlier indications, the Court will entertain motions for orders to show cause on the various matters raised by Ms. Hill's testimony. Any resulting contempt proceedings

will be distinct from and will not preclude a subsequent referral of disciplinary matters to the Merit Systems Protection Board's Office of Special Counsel pursuant to FOIA section (a)(4)(F).

ducted. In short, insofar as the Court aware, the government has not pursued any remedial or disciplinary action.

It must be noted, however, that the USAO–DC has offered to investigate the matters raised by Ms. hill's testimony if referred by the Court, and has asked the Court how it should proceed; Deputy Attorney General Holder filed an affidavit with the Court to this effect. Without discouraging this kind of communication, the Court notes that, absent a specific statutory provision such as section (a)(4)(F) of the FOIA, the courts ordinarily do not direct the internal disciplinary proceedings of the agencies, which have an independent duty to ensure that their employees act lawfully and ethically. While the USAO–DC's offer is appreciated as a signal of that office's good faith and willingness to cooperate, it does little to ameliorate the failure of the Department of Commerce to investigate the events of this FOIA controversy. Only the agencies can effectively defend their own integrity by maintaining zero tolerance for this kind of misconduct.

In addition, neither the DOC nor the DOJ has reported to the Court on any investigation of the failure to produce the DNC minority donor list, despite the USAO–DC's representations to the Court in May and July of 1997 that the matter had been referred to the Inspector General of the DOC, with notification of the referral to the Public Integrity division of the DOJ. The Court can only assume that no investigative action has been taken. Although the DOJ's position, if any, as to this matter is unclear, the stance of the DOC can be inferred from its decision in December of 1997 to give awards to several employees involved in this litigation. As explained in the awards ceremony program, filed with the Court on March 23, 1998, employees including Mary Ann McFate (one of the principal contributors of affidavits supporting the DOC's *Vaughn* indices), Brenda Dolan (who in sworn deposition testimony claimed to have only a minimal role in the document search), and Peter Han were "recognized for their contributions to the Commerce Department's efforts to respond appropriately to numerous inquiries relating to political fundraising and its possible relationship to the Department. They have shown unusual commitment and professional cooperation in ensuring accurate, timely results." Department of Commerce, Forty–Ninth Annual Awards Program, December 2, 1997. Finding no words to adequately express its incredulity, the Court simply disagrees.

2. May 20, 1998 *In Camera* Submission

On May 20, 1998, DOC revealed that parts of several documents ordered submitted for *in camera* review had been destroyed. Apparently, before releasing copies to Judicial Watch, DOC had redacted the originals; for some documents, the only true copy of the information was destroyed. This is, of course, yet another indication of the agency's carelessness in handling its response to plaintiff's FOIA requests. However, the Court has reviewed the redacted copies *in camera* and is satisfied that the information apparently deleted (social security numbers and financial information, for the most part) was properly withheld from Judicial Watch.

3. September 11, 1998 Hearing

On September 9, 1998, Judicial Watch somewhat dramatically requested an *in camera* conference regarding newly discovered evidence that it claimed showed obstruction of justice by the DOC. On September 11, 1998, the parties met with the Court to review the new evidence, which amounted to two unreleased and allegedly responsive documents which Judicial Watch had discovered and which suggested communication between the DOC and the DNC with regard to trade missions. Based on the evidence presented by Judicial Watch and on the argument of the parties, the Court issued an order permitting limited discovery from the DNC and ordering the seizure by the DOC Inspector General of the computers and computer equipment of Sally Painter, Melissa Moss, John Ost, and Gail Dobert, to be searched for electronic copies of responsive information. The Inspector General has yet to report to the Court on the progress of that search.

### J. *Current Status*

At this stage in the litigation, some limited discovery is still ongoing, and numerous motions are pending, almost all of which are plaintiff's motions for sanctions, compulsion of discovery, or requests for approval of additional discovery. On September 30, 1998, Judicial Watch submitted a list of pending motions requiring disposition if the Court were to deny the DOC's motion for entry of judgment. These motions will be disposed of in a separate order issued this date. In addition, consistent with its previous indications, the Court will entertain motions for orders to show cause relating to possible criminal contempt proceedings arising out of the testimony of Nolanda Hill. All other discovery matters should be pursued before the Magistrate Judge appointed to supervise continued discovery.

In conclusion, this somewhat tedious narration presents numerous instances of likely violations of the Freedom of Information Act and this Court's orders. On many occasions, the DOC appears to have engaged in the illegal withholding of responsive documents, in the removal of such documents from the DOC, and in the destruction of potentially responsive documents in the office of the late Secretary Brown and elsewhere, as well as a great deal of misconduct during the litigation which the Court leaves for another day's decision. Upon consideration of this record, and of the legal issues discussed in Part II, the Court finds that a new search alone is an insufficient remedy, and thus the DOC's motion will be denied, partial summary judgment will be granted in favor of Judicial Watch ordering the commencement of the search proposed in the motion, and further discovery under the supervision of a Magistrate Judge will be ordered.

## II.  LEGAL ISSUES

In contrast to the controversial facts of this case, the legal issues presented by the DOC's motion for entry of judgment at first glance seemed innocuous. Upon further reflection, however, the Court has wrestled somewhat with how to properly dispose of the motion given the unusual factual context of gross violations of the FOIA and court orders.

A motion by a party for judgment against itself presents a novel situation, particularly in the face of opposition by the nonmoving party. The Federal Rules of Civil Procedure are silent on the issue, and the Court is not familiar with any case, reported or otherwise, that has dealt with it. Nevertheless, if necessary, the Court would find that it does indeed have the power to grant the DOC's motion. The particular facts of this case preclude it, however, at least until the plaintiff has had a fair opportunity to locate through discovery the documents to which it is entitled under the FOIA. Because the DOC's motion fails to offer Judicial Watch full relief, the motion must be denied.

In place of the government's motion, however, the Court will grant partial summary judgment against the DOC and order the search proposed in its motion. The Court will also order a Magistrate Judge to preside over discovery designed to explore the extent to which the DOC has illegally destroyed and discarded responsive information, and possible methods for recovering whatever responsive information still exists outside of the DOC's possession. Together, the new search and the supervised discovery will effectuate the legitimate purposes of the DOC's motion without unjustly prejudicing the plaintiff's right to pursue the fullest relief available to it. Today's decision will significantly narrow the scope of continued proceedings, which will focus primarily on the issues of illegal destruction and removal of documents. Consequently, it will expedite the remainder of this litigation, consistent with the government's aims in filing its motion. The close supervision of the discovery should also ease the DOC's frustration at Judicial Watch's persistent attempts to transform this FOIA litigation into a larger political inquisition. However, today's decision will simultaneously protect the right of Judicial Watch to pursue its statutory entitlement under the FOIA, and it will hold the DOC accountable for its blatant and egregious violations of the Act and this Court's orders.

## A. *Denial of the DOC's Motion*

The first issue to be addressed is the disposition of the DOC's motion for entry of judgment against itself. As far as the Court is aware, this motion is totally without precedent. Equally as surprising as the motion itself, however, is plaintiff's strident opposition to the entry of judgment in its favor. Ultimately, although the Court does have the power to grant such a motion under certain narrow circumstances, it is not warranted in this case.

■ As a general proposition, a district court may grant a moving party's motion for entry of judgment against itself, even over the opposition of the nonmoving party, if (1) there is no genuine issue of material fact at issue, (2) the nonmoving party is entitled to judgment as a matter of law, and (3) the motion offers to the nonmoving party the fullest relief available under the law. The Court bases this conclusion on many considerations, including primarily reference to the purpose and provisions of the Federal Rules of Civil Procedure. However, it is unnecessary to explain this reasoning in detail, because upon examination the DOC's motion fails to offer Judicial Watch the full extent of relief available.

■ The DOC argues that the full extent of relief available to a plaintiff suing under the Freedom of Information Act consists of a judgment ordering the following: (1) that the agency conduct a new, legally adequate search for documents, (2) that the agency release to plaintiff, or identify in a legally sufficient *Vaughn* index, all responsive documents, and (3) that the agency pay to plaintiff reasonable attorney's fees and litigation costs. Indeed, the DOC's motion offers all this and more. In its Amendment to Defendant's Motion To Enter Judgment, filed March 20, 1998, the DOC (1) details how the new search will be supervised by the DOC Office of Inspector General, (2) specifies the bureaus of the DOC that will be searched, (3) outlines procedures for contacting former employees in an effort to locate responsive documents that may have been removed from the DOC's possession, (4) suggests form instructions that will be provided to all offices searched, and (5) offers to submit sworn declarations from each office searched, executed by individuals with actual personal knowledge of the matters attested to. This is considerably more thorough than the new search that a court would ordinarily order when granting judgment in favor of a FOIA plaintiff.

However, after much thought on the subject, the Court is of the opinion that such a search (plus attorney's fees) does not represent the full extent of relief available to Judicial Watch in this case. There is substantial evidence that the DOC has destroyed documents and removed documents from its control in an effort to avoid releasing them to Judicial Watch. If the Court were to grant the DOC's motion and merely order a new search, these documents would not be found even by the most exhaustive of searches, and the DOC would have succeeded in circumventing the FOIA.

The DOC recognizes this situation and proposes in its motion a plan for retrieving jettisoned information. The DOC offers to mail letters to former employees of three offices within the DOC and request that the former employees determine whether they may have removed documents from the DOC when they left and, if so, that they search the documents for information responsive to Judicial Watch's FOIA requests. While this plan is a step in the right direction, the remedy for the government's misconduct in this case must have more "teeth" than the DOC proposal offers. The courts cannot be powerless to remedy FOIA violations where the agency simply discards potentially damaging responsive documents. There must be some mechanism by which the courts can keep the agencies from circumventing the FOIA by simply removing responsive documents from its control.

In the Court's opinion,[8] the most significant apparent obstacle to holding the DOC accountable for destroying and discarding

---

8. The parties offered virtually no legal argument on the complex issues raised by the DOC's motion.

documents is the general proposition that a final judgment may only be enforced against parties to the action before the court. Even were the Court to refer disciplinary matters to the Office of Special Counsel pursuant to FOIA section (A)(4)(F),[9] and even were it further to conduct contempt proceedings against those agency employees responsible for the illegal activities, the agency would still have a powerful incentive to destroy or jettison potentially harmful documents if the agency knew that the documents would then be permanently outside the reach of the FOIA requester and the federal courts. The agency would know that, when threatened, it could violate the law with relative impunity.

Fortunately, the courts are not in such a powerless position when faced with the destruction and discarding of responsive documents. In certain circumstances, a judgment may be enforced against nonparties. See 12 Charles Alan Wright, Arthur R. Miller, *Federal Practice and Procedure* § 3033, at 177. For example, as stated in Federal Rule of Civil Procedure 65(d), an injunction is binding upon the parties *and* "upon those persons in active concert or participation with them that receive actual notice of the order ..." A number of cases have affirmed the courts' authority to enforce their orders on nonparties, based in part upon Federal Rule of Civil Procedure 71.[10] According to the Court of Appeals for the Second Circuit, "It seems clear that Rule 71 was intended to assure that process be made available to enforce court orders in favor of and against persons who are properly affected by them, even if they are not parties to the action." *Lasky v. Quinlan*, 558 F.2d 1133, 1137 (2d Cir.1977) (citing 7 J. Moore, *Federal Practice* at 71.10 (1975)). This view was adopted by the Ninth Circuit in *Westlake North Property Owners Association v. City of Thousand Oaks*, 915 F.2d 1301, 1304 (9th

Cir.1990), in which the court stated: "Rule 71 was designed to memorialize the common-sense rule that courts can enforce their orders against both parties and non-parties." *Id.* In particular, the courts are willing to enforce orders against nonparties when their nonparty status is used as a shield to frustrate the courts' orders. *See, e.g., Wilson Motor Co. v. Dunn,* 129 Okla. 211, 264 P. 194, 197 (Olka.1928) ("Such an absurd contention could only prevail where might was right and where utter contempt was in vogue of all law, courts, and orderly procedure.").

Tucked away in a footnote in its reply brief, the DOC argues that "the documents taken from the Department after the search (*e.g.*, by Ira Sockowitz ... David Rothkopf) [cannot] be considered 'missing documents,' because documents not in the possession of the agency, even if wrongfully removed ..., are not considered to be 'improperly withheld' by the agency. *See Kissinger v. Reporters Committee*, 445 U.S. 136, 148–52, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980)." Def.'s Reply at 9. The DOC's statement of the law is incorrect, and its reliance on *Kissinger* is in error.

In *Kissinger,* the Supreme Court held with regard to the FOIA that "Congress did not mean that an agency improperly withholds a document which has been removed from the possession of the agency *prior to the filing of the FOIA request." Kissinger,* 445 U.S. at 150, 100 S.Ct. 960 (emphasis added.). The Court itself recognized the importance of the temporal restriction in its ruling on the three FOIA requests at issue in that case. The Court found no improper withholding for two of the requests, which the Court noted had been "filed *after* Kissinger's notes had been deeded to the Library of Congress." *Id.* at 154, 100 S.Ct. 960 (emphasis added). In contrast, the Court said of the third request:

9. In this regard, the Court finds merit in the view that the district courts should be more willing to refer disciplinary matters to the Office of Special Counsel when agencies act arbitrarily and capriciously in defiance of the FOIA. *See generally* Paul M. Winters, Note, *Revitalizing the Sanctions Provision of the Freedom of Information Act Amendments of 1974,* 84 Geo.L.J. 617 (1996). However, the statute clearly envisions (although perhaps does not require) that such a referral come at the end of litigation, when the issues of

attorney's fees and costs are normally addressed; for this reason, the Court declines to consider the appropriateness of such a referral at this time.

10. Fed.R.Civ.P. 71 states in relevant part: "[W]hen obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for enforcing obedience to the order as is a party."

"At the time when Safire submitted his request for certain notes of Kissinger's telephone conversations, all the notes were still located in Kissinger's office at the State Department. *For this reason,* we do not rest our resolution of his claim on the grounds that there was no withholding by the State Department." *Id.* at 155, 100 S.Ct. 960 (emphasis added). The clear implication is that the status of a particular document *at the time the FOIA request is submitted* determines whether the unreasonable failure to produce that document is an unlawful withholding. If the document is removed *before* filing of the request, then failure to produce it *is not* an improper withholding. In contrast, if the document is removed *after* the filing of the request, failure to produce it *is* an improper withholding.

Two Justices, each concurring in part and dissenting in part, recognized the importance of the timing of the removal of documents, particularly if done in an attempt to circumvent the FOIA. Justice Brennan noted: "Even the Court's opinion implies—as I think it must—that an agency would be improperly withholding documents if it failed to recover papers removed from its custody deliberately to evade an FOIA request." *Id.* at 159, 100 S.Ct. 960 (Brennan, J., concurring in part and dissenting in part). Justice Stevens worried that the majority decision "creates an incentive for outgoing agency officials to remove potentially embarrassing documents from their files in order to frustrate *future* FOIA requests." *Id.* at 161, 100 S.Ct. 960 (Stevens, J. concurring in part and dissenting in part) (emphasis added). Both Justices' observations support the plain reading of the majority's holding that the time at which the FOIA request is submitted is the time when documents must be in the possession of the agency for the FOIA's disclosure requirement to apply.

Contrary to the DOC's assertion, the Supreme Court's decision in *Kissinger* does not permit agencies to evade the FOIA by removing documents from their control after the filing of a FOIA request; in fact, it

explicitly rejected that contention with regard to the Safire FOIA request. In the opinion of this Court, a contrary ruling would go well beyond the concern of Justice Stevens that outgoing officials would remove documents to thwart *possible, future* FOIA requests; it would allow the DOC or any other agency to conduct a search, sort the responsive documents by political "sensitivity," and then remove the potentially damaging documents, secure in the knowledge that the FOIA requester would never see them (which may well be, in part, what happened here). Such a result would render the FOIA hollow and the courts powerless to intervene. Fortunately, the law does not require such agency misconduct to go unremedied.

The import of the preceding discussion for this litigation is twofold. First, as a general matter, these cases support the courts' power to remedy illegal actions, such as those of the DOC, by issuing orders and judgments that must be complied with even when nonparties are involved. In the context of this FOIA action, for example, this Court's orders compelling production of illegally withheld documents may be enforced not only against the DOC but also against any nonparties to which the DOC transferred possession of responsive documents in an attempt to circumvent the FOIA and the orders of this Court. Second, the availability of this remedy to Judicial Watch makes clear that the DOC's motion fails to offer Judicial Watch the full extent of relief available under the law, because it provides no reliable mechanism by which to identify those nonparties who must be bound by the order and judgment.[11] For this reason alone, the Court declines to grant the DOC's motion.

### B. *Partial Summary Judgment*

Although the Court must deny the DOC's motion for entry of judgment, it is not necessary to continue this litigation unmodified. The arguments of the parties and the record in this case persuade the Court that the interests of justice and judicial economy are best served by an entry of partial summary

---

11. Incidentally, neither does the DOC motion suggest a referral to the Office of Special Counsel pursuant to section (a)(4)(F) of the FOIA; however-

er, this statutory mechanism is not truly "relief" for the plaintiff, but is instead a mechanism to be employed at the court's discretion.

judgment resolving the greater part of this controversy, which is apparently largely undisputed. There is, at this stage of the litigation, no argument, and certainly no reasonable argument, that the DOC's document search was reasonable and legally adequate under the FOIA. On this issue, Judicial Watch is entitled to judgment as a matter of law.

█ Although Judicial Watch has not moved for summary judgment, the Court has the authority to enter summary judgment even in the absence of a motion. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, § 2720, at 347–352; *see also Leahy v. District of Columbia,* 833 F.2d 1046, 1047 (D.C.Cir.1987) (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, § 2720). The Supreme Court recognized the district courts' authority to enter summary judgment sua sponte in *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). According to Professors Wright et al., the court may enter summary judgment on its own initiative so long as the parties are given sufficient advance notice and an adequate opportunity to demonstrate that summary judgment is inappropriate. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *supra*, § 2720, at 339. "To conclude otherwise," the professors write, "would result in unnecessary trials and would be inconsistent with the objective of Rule 56 of expediting the disposition of cases." *See id.* § 2720, at 345. It would also be inconsistent with the purposes underlying the Rules in general, which according to Federal Rule of Civil Procedure 1 "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."

Here, the parties have had ample time and opportunity to address the appropriateness of entering judgment at this stage of the proceedings. The DOC's motion for entry of judgment was filed in August of 1997. Since then the DOC has amended it, Judicial Watch has vigorously opposed it, and the DOC has filed a reply brief supporting it. Although the parties have failed to offer much persuasive legal argument in these filings, it has not been for lack of opportunity. The DOC apparently felt that its motion would be granted outright, and so its motion included virtually no legal argument. The DOC then devoted most of its reply to arguing that Judicial Watch's opposition failed to show that entry of judgment was *in* appropriate. Judicial Watch, for its part, offered some legal arguments, but its opposition focused primarily on the need for further discovery to explore the DOC's abuses, discovery that is ordered by today's decision. Both parties had sufficient advance notice and the opportunity to persuade the Court that judgment on the adequacy of the search was inappropriate, but they failed to do so.

Therefore, the Court may enter partial summary judgment as to the adequacy of the DOC's search if the Rule 56 standard is satisfied. Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the ... party is entitled to judgment as a matter of law." The record in this case establishes beyond any reasonable dispute that the DOC's search was inadequate, unreasonable, and unlawful under the FOIA. The DOC failed to search entire offices that were likely, if not certain, to hold responsive documents. Documents were destroyed, discarded, and given away, sometimes without being searched to determine if they were responsive, other times with full knowledge that they were responsive. There can be no genuine issue as to the reasonableness of the DOC's document search, which is the only fact material to this entry of partial summary judgment.[12]

---

**12.** Today's decision does not deal with the propriety of the DOC's invocation of various FOIA exemptions to justify withholding particular responsive documents. That issue was dealt with initially in the Court's decision of September 6, 1997, which will be reinstated by separate order this date. Also, as mentioned above, there are a number of documents which were discovered since the DOC filed its most recent *Vaughn* index. The DOC is directed to compile an index and affidavits for those documents as soon as possible so that remaining issues in this regard can be speedily resolved.

■ For this same reason, Judicial Watch is entitled to judgment as a matter of law. The FOIA confers upon each requester a right to a reasonable search, and when an agency search is demonstrated to be unreasonable, the FOIA plaintiff is entitled to judgment as a matter of law and a new search. *See, e.g., Kronberg v. United States Dep't of Justice,* 875 F.Supp. 861, 871 (D.D.C. 1995).

Partial summary judgment as to the adequacy of the DOC document search is appropriate and will be entered. The DOC will be ordered to conduct the search proposed in its order, the details of which are set forth in the separate order issued this date. The requirements imposed upon the DOC in conducting this search are more restrictive and rigorous than those ordinarily ordered as relief in a FOIA case, but the egregious facts of this case make such requirements entirely necessary to ensure agency compliance with the law and this Court's orders.

### C. *Supervised Discovery*

Although the judgment and orders of this Court will be enforceable against nonparties, they will bind only those nonparties who can be shown to have acted in concert with the DOC in the removal of documents or to be currently in possession of the documents.[13] Consequently, further discovery is required to identify those nonparties. Some discovery from the DNC has already been authorized, and it should proceed as ordered. In addition, several pending motions will be resolved by separate orders issued this date.

The Court is of the opinion that continued discovery proceedings must be closely supervised. The main issues to be explored in the discovery ordered today are the removal and destruction of documents, including who was responsible for the action, when and where

the action occurred, where and to whom the information was transferred, where the materials are currently located, and who is in custody of them. Plaintiff should be allowed to inquire into any discoverable information related to the destruction or removal of documents after its first FOIA request was filed. This may include, out of necessity, some inquiry into the creation and handling of documents. Therefore, the Court declines to articulate too narrow a restriction on Judicial Watch's further discovery at this point, so long as it is reasonably aimed, in the judgment of the Magistrate Judge, at identifying instances of unlawful destruction and removal of documents by the DOC. Documents still located at the DOC should be located and processed during the new search ordered this date.

However, Judicial Watch should not be allowed to stray from inquiries that might be reasonably calculated to lead to evidence of unlawful destruction or removal of documents. Counsel for the DOC is not entirely unreasonable in its frustration with Judicial Watch's conduct during depositions. To ensure proper conduct and compliance with the direction set by today's order, all further discovery will be authorized by, scheduled by, and conducted in the presence of Magistrate Judge John Facciola. Magistrate Judge Facciola will also decide all matters arising during the course of depositions, including objections, motions to compel, motions to quash or modify subpoenas, and motions for protective orders.[14] The Court expects that this arrangement will facilitate the expedient conclusion of discovery and encourage an appropriate professional demeanor among counsel.

### III. CONCLUSION

Although the Court declines to end this long and extraordinary litigation today, it is

---

13. Obviously, today's ruling would have little effect if the Court's orders and judgment were binding only on the initial recipient of documents removed from the agency. If the documents could be shielded simply by passing them to other persons one more step removed from the agency, the FOIA would be just as easily frustrated.

14. The Court recognizes that, under Federal Rule of Civil Procedure 45(c)(3)(A)(ii), this arrange-

ment will not apply to the depositions of nonparties who resides more than one hundred miles from the District of Columbia. This circumstance may necessitate the appointment of Magistrate Judge Facciola as a Special Master, which would raise issues as to the payment of expenses by the government and other logistical considerations. These issues, however, will be addressed if and when they arise.

now appropriate to set in motion the beginning of the end. The DOC's unprecedented motion for entry of judgment against itself will be denied, but partial summary judgment will be entered in favor of Judicial Watch and the DOC will be ordered to perform a rigorously monitored new search. In addition, further discovery under the close supervision of a Magistrate Judge will be authorized.